Exhibit A

**Fern Hall Limited Partners' Privilege Log I**

| DOC# | PrivilegeType | Date | Sender/Author | To | CC | Subject Matter | BatesNumbers | RedactionReasons |
|---|---|---|---|---|---|---|---|---|
| 1 | AC/WP | 12/27/2006 | Joanne L. Fisher, Honigman Miller Scwartz & Cohn LLP | Linda Cheers, MMA Financial LLC | Scott Sergio, Esq.; Roberta Russ, Esq. | Letter from counsel to client re: Due Diligence Fern Hall Partnership | | |
| 2 | AC/WP | 12/29/2006 | Nixon Peabody LLP | MMA FernHall Crossing LLC | | Letter from counsel to client re: Firm Hall Partnership | BFIM005005-5086 | Attorney-Client |
| 3 | WP | 6/12/2017 | Edward Ronan <Edward.Ronan@bfim.com> | Jeff Rahn <Jeff.Rahn@bfim.com> | | Email re: Magnolia Place and Laurel Oaks Projects in anticipation of litigation in connection with those Projects | | |
| 4 | AC/WP | 8/28/2017 | Edward Ronan <Edward.Ronan@bfim.com> | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Jeff Rahn <Jeff.Rahn@bfim.com>;Mike Gladstone <Mike.Gladstone@bfim.com> | Email with attachments from client to counsel re: Laurel Oaks Buyout Notification | | |
| 5 | AC/WP | 8/28/2017 | Edward Ronan | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Jeff Rahn <Jeff.Rahn@bfim.com>;Mike Gladstone <Mike.Gladstone@bfim.com> | Email with attachments from client to counsel re: Laurel Oaks Buyout Notification | | |
| 6 | AC/WP | 8/28/2017 | Edward Ronan | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | | Email with attachments from client to counsel re: Magnolia Buyout Notification | | |
| 7 | AC/WP | 9/12/2017 | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Mike Gladstone <Mike.Gladstone@bfim.com>;Edward Ronan <Edward.Ronan@bfim.com> | | Email with attachment from counsel to client re: Douglas litigation | | |
| 8 | AC/WP | 9/12/2017 | Mike Gladstone <Mike.Gladstone@bfim.com> | Ken Cutillo <Ken.Cutillo@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | Edward Ronan <Edward.Ronan@bfim.com> | Internal BFIM Email from in-house counsel with attachment re: Douglas Litigation | | |
| 9 | AC/WP | 9/12/2017 | Mike Gladstone <Mike.Gladstone@bfim.com> | Ken Cutillo <Ken.Cutillo@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | Edward Ronan <Edward.Ronan@bfim.com> | Internal BFIM Email from in-house counsel with attachment  re: Douglas Litigation | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10 | AC/WP | 9/18/2017 | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Mike Gladstone <Mike.Gladstone@bfim.com>;Edward Ronan <Edward.Ronan@bfim.com> | | Email from counsel to client re: Douglas litigation | |
| 11 | AC/WP | 9/18/2017 | Edward Ronan <Edward.Ronan@bfim.com> | Tami McKnew <Tami.McKnew@smithmoorelaw.com>;Mike Gladstone <Mike.Gladstone@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | | Email from client to counsel re: Douglas litigation | |
| 12 | AC/WP | 9/18/2017 | Edward Ronan | Tami McKnew <Tami.McKnew@smithmoorelaw.com>;Mike Gladstone <Mike.Gladstone@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | | Email from client to counsel re: Douglas Litigation | |
| 13 | AC/WP | 9/18/2017 | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Edward Ronan <Edward.Ronan@bfim.com>;Mike Gladstone <Mike.Gladstone@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | | Email from client to counsel re: Douglas litigation | |
| 14 | AC/WP | 9/21/2017 | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Mike Gladstone <Mike.Gladstone@bfim.com>;Edward Ronan <Edward.Ronan@bfim.com>;Jeff Rahn <Jeff.Rahn@bfim.com> | | Email from counsel to client re: Laurel Oaks Litigation | |
| 15 | AC/WP | 6/14/2018 | Stephen Rogers <Stephen.Rogers@bfim.com> | Janice Loving <Janice.Loving@bfim.com> | | Email with attachment: Portfolio Risk and Investment Management Committee Memorandum re: Fern Hall Valuation ("PRIM Memo")(prepared in anticipation of litigation in connection with Fern Hall I Project) | |
| 16 | AC/WP | 6/14/2018 | Steve Rogers | Portfolio Risk and Investment Management Committee including Mike Gladstone, in-house counsel | | PRIM Memo | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17 | AC/WP | 6/15/2018 | | Armando Perez, Marie Reynolds, Jeff Rahn, Mike Gladstone, Rocio Luhring, Carrie Octavio, Silvia Rimolo,Steven West, Stephen Rogers, Stephen Burns, Kristen Duffy, Alex Chan | | Appointment re: PRIM Presentations; attaches PRIM Memo | | |
| | | | | | | | | |
| 18 | AC/WP | 6/18/2018 | Janice Loving | Janice Loving; Armando Perez; Marie Reynolds; Jeff Rahn; Mike Gladstone; Rocio Luhring;Carrie Octavio; Silvia Rimolo; Steven West; Stephen Rogers | Stephen Burns; Kristen Duffy; Alex Chan | Appointment re: PRIM Presentations; attaches PRIM Memo | | |
| | | | | | | | | |
| 19 | AC/WP | 6/19/2018 | Janice Loving <Janice.Loving@bfim.com> | Sara Ahlander <Sara.Ahlander@bfim.com> | | Email Re: PRIM Memos; attaches PRIM Memo | | |
| | | | | | | | | |
| 20 | AC/WP | 6/22/2018 | Sara Ahlander <Sara.Ahlander@bfim.com> | Fund Managers <FundManagers@BFIM.COM> | | Email Re: PRIM Memos; attaches PRIM Memo | | |
| | | | | | | | | |
| 21 | AC/WP | 6/26/2017 | Janice Loving | Janice Loving, Jeff Rahn, Ali Abdullah, Bill Miller, Edward Ronan, Eric BFIM, Eric Bonney, Eric Rosenthal,Lisa Grammatikov, Mike Gladstone, Nancy Powell, Stephen Rogers, Steven West, Greg Voyentzie, Armando Perez,William Anderson, Kathryn Farrell, Abby Banholzer, Fund Managers, Matthew Delaney, David J. Fernandes,Geoffrey Giancola, Stephen Burns, Jerry Abrahams, Ken Cutillo, Marie Reynolds, Rocio Luhring, Sara Ahlander,Sarah Laubinger, Matthew Strauss | | Appointment: Screening Committee: Disposition Refinancing and Workout attaches Capital Transaction Team ("CTT") Report below | | |
| | | | | | | | | |
| 22 | AC/WP | 6/26/2017 | Edward Ronan and multiple authors | | | CTT Report/Weekly Priority Deals: Magnolia and Laurel Oaks Projects prepared in anticipated of litigation in connection with those projects | | |
| | | | | | | | | |

| | | | | | | | |
|----|-------|----------|-------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|--|----------------------------------------------------------------------------------------------------------------------------------|--|--|
| 23 | AC/WP | 7/10/2017 | Janice Loving | Ali Abdullah, Bill Miller, Edward Ronan, Eric BFIM, Eric Bonney, Eric Rosenthal, Jeff Rahn, Lisa Grammatikov,Mike Gladstone, Nancy Powell, Stephen Rogers, Steven West, Greg Voyentzie, Armando Perez, Ken Cutillo,Marie Reynolds, Rocio Luhring, Sara Ahlander, Sarah Laubinger, William Anderson, Kathryn Farrell, Abby Banholzer,Fund Managers, Matthew Delaney, David J. Fernandes, Geoffrey Giancola, Stephen Burns, Jerry Abrahams, Matthew Strauss, David Anastasi, Jill Whitney, Dave Brady, Andrew Philips | | Appointment: Screening Committee: Disposition Refinancing and Workout attaches CTT Report below | | |
| 24 | AC/WP | 7/6/2017 | Edward Ronan and multiple authors | | | CTT Report/Weekly Priority Deals: buyout option process for Magnolia and Laurel Oaks Projects prepared in anticipated of litigation in connection with those projects | | |
| 25 | WP | | Janice Loving | Ali Abdullah, Bill Miller, Edward Ronan, Eric BFIM, Eric Bonney, Eric Rosenthal, Jeff Rahn, Lisa Grammatikov,Mike Gladstone, Nancy Powell, Stephen Rogers, Steven West, Greg Voyentzie, Armando Perez, Ken Cutillo, Marie Reynolds, Rocio Luhring, Sara Ahlander, Sarah Laubinger, William Anderson, Kathryn Farrell, Abby Banholzer, Fund Managers, Matthew Delaney, David J. Fernandes, Geoffrey Giancola, Stephen Burns, Jerry Abrahams, Matthew Strauss, David Anastasi, Dave Brady, Andrew Philips, Jerry Abrahams, Lisa Carpenter, Trevor Johnson, | | Appointment: Screening Committee: Disposition Refinancing and Workout attaches CTT Report below | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 26 | WP | 7/28/2017 | Unknown Author | | | Capital Transaction Team Report/Weekly Priority Deals: Douglas Litigation, Magnolia Place and Laurel Oaks | | |
| 27 | WP | 8/14/2017 | Janice Loving | Eric BFIM, William Anderson, Kathryn Farrell, Matthew Delaney, David J. Fernandes, Geoffrey Giancola, Stephen Burns, Jill Whitney | | Canceled: Screening Committee: Disposition, Refinancing and Workout attaches CTT Report below | | |
| 28 | WP | 8/11/2017 | Unknown author | | | Capital Transaction Team Report/Weekly Priority Deals: Douglas Litigation, Magnolia Place and Laurel Oaks prepared in anticipated of litigation in connection with those projects | | |
| 29 | AC/WP | 8/25/2017 | Janice Loving <Janice.Loving@bfim.com> | li Abdullah; Bill Miller; Edward Ronan; Eric BFIM; Eric Bonney; Eric Rosenthal; Jeff Rahn; Lisa Grammatikov;Mike Gladstone; Nancy Powell; Stephen Rogers; Steven West; Greg Voyentzie; Armando Perez; Ken Cutillo;Marie Reynolds; Rocio Luhring; Sara Ahlander; Sarah Laubinger; William Anderson; Kathryn Farrell; Abby Banholzer;Fund Managers; Matthew Delaney; David J. Fernandes; Geoffrey Giancola; Stephen Burns; Jerry Abrahams;Matthew Strauss; David Anastasi; Dave Brady; Andrew Philips; Jerry Abrahams; Brian Benson; Michael Butler;Carolyn Grassick; Cameron Church; Marshall Daniels | | Email Re: Capital Transaction Committee Screening - Monday, August 28 attaches CTT Report below | | |
| 30 | AC/WP | 8/25/2017 | Edward Ronan and multiple authors | | | CTT Report/Weekly Priority Deals re: buyout option process for Magnolia and Laurel Oaks Projects in anticipated of litigation in connection with those projects | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 31 | WP | 9/18/2017 | Janice Loving | Ali Abdullah, Bill Miller, Edward Ronan, Eric BFIM, Eric Bonney, Eric Rosenthal, Jeff Rahn, Lisa Grammatikov,Mike Gladstone, Nancy Powell, Stephen Rogers, Steven West, Greg Voyentzie, Armando Perez, Ken Cutillo, Marie Reynolds, Rocio Luhring, Sara Ahlander, Sarah Laubinger, William Anderson, Kathryn Farrell, Abby Banholzer,Fund Managers, Matthew Delaney, David J. Fernandes, Geoffrey Giancola, Stephen Burns, Jerry Abrahams, Matthew Strauss, David Anastasi, Jill Whitney, Dave Brady, Andrew Philips, Jerry Abrahams, Brian Benson,Trevor Johnson, Michael Butler, Nicole Jaynes, Sean Beirne | | Appointment: Screening Committee: Disposition Refinancing and Workout attaches CTT Report below | | |
| 32 | WP | 9/15/2017 | Edward Ronan and multiple authors | | | Capital Transaction Team Report/Weekly Priority Deals : Douglas Litigation, Magnolia Place and Laurel Oaks in anticipated of litigation in connection with those projects | | |

| 33 | AC/WP | 9/25/2017 | Janice Loving | Janice Loving, Ali Abdullah, Bill Miller, Edward Ronan, Eric Bonney, Eric Rosenthal, Jeff Rahn, Lisa Grammatikov,Mike Gladstone, Nancy Powell, Stephen Rogers, Steven West, Greg Voyentzie, Armando Perez, Ken Cutillo, Marie Reynolds, Rocio Luhring, Sara Ahlander, Sarah Laubinger, Kristen Duffy, Marshall Daniels, William Anderson,Kathryn Farrell, Fund Managers, Matthew Delaney, David J. Fernandes, Geoffrey Giancola, Stephen Burns, Jerry Abrahams, Matthew Strauss, David Anastasi, Dave Brady, Andrew Philips, Abrahams, Jerry, Brian Benson, Michael Butler, Nicole Jaynes, Sean Beirne, Lisa Carpenter | | Appointment: Screening Committee: Disposition, Refinancing and Workout attaches CTT Report below | | |
| 34 | WP | 9/21/2017 | Edward Ronan and multiple authors | | | CTT Report/Weekly Priority Deals litigation with respect to Magnolia and Laurel Oaks Projects | | |

**FERN HALL PRIVILEGE LOG I - EMAIL RECIPIENTS**

| | |
|---|---|
| Ali Abdullah | Senior Analyst, Capital Transactions (No longer with BFIM) |
| Jerry Abrahams | Chief Executive Officer of ORIX Commercial Mortgage Servicing Inc. |
| David Anastasi | Vice President, Fund Management (No longer with BFIM) |
| William Anderson | First Vice President, Capital Transactions (Workouts) |
| Sara Ahlander | Senior Vice President, Fund Management |
| Abby Banholzer | Executive Assistant to CEO (No longer with BFIM) |
| Sean Beirne | Senior Associate, Production Group |
| Brian Benson | Vice President, Fund Management |
| Eric Bonney | First Vice President, Capital Transactions (Workouts) |
| Stephen Burns | First Vice President, Asset Management |
| David Brady | Vice President, Fund Management |
| Michael Butler | Vice President, Fund Management |
| Lisa Carpenter | Vice President, Asset Management |
| Alex Chan | Vice President, Asset Management |
| Cameron Church | AVP, Asset Management (No longer with BFIM) |
| Ken Cutillo | Chief Executive Officer of BFIM (No longer with BFIM) |
| Marshall Daniels | Vice President, Asset Management |
| Matthew Delaney | First Vice President, Asset Management |
| Kristen Duffy | Vice President, Asset Management |
| Kathryn Farrell | First Vice President, Capital Transactions |
| David J. Fernandes | First Vice President, Asset Management |
| Geoffrey Giancola | First Vice President, Asset Management |
| Mike Gladstone | Executive Vice President, General Counsel |
| Lisa Grammatikov | First Vice President, Capital Transactions |
| Carolyn Grassick | Vice President, Asset Management |
| Nicole Jaynes | Executive Assistant to CEO |
| Trevor Johnson | Vice President, Asset Management (No longer with BFIM) |

| | |
|---|---|
| Sarah Laubinger | Executive Vice President, Production |
| Janice Loving | Adminstrative Assistant |
| Rocio Luhring | Senior Vice President, Asset Management |
| Gavin McClear | First Vice President, Fund Management |
| Bill Miller | Vice President, Capital Transactions |
| Carrie Octavio | Vice President, Asset Management |
| Armando Perez | Executive Vice President, Investment Management |
| Andrew Phillips | First Vice President, Fund Management |
| Nancy Powell | First Vice President, Capital Transactions |
| Jeffrey Rahn | Executive Vice President, Capital Transactions |
| Marie Reynolds | Executive Vice President, Chief Financial Officer |
| Silvia Rimolo | Vice President, Asset Management (No longer with BFIM) |
| Stephen Rogers | First Vice President, Capital Transactions |
| Edward Ronan | First Vice President, Capital Transactions |
| Eric Rosenthal | Senior Analyst, Capital Transactions (No longer with BFIM) |
| Matthew Strauss | AVP, Production |
| Greg Voyentzie | Chief Executive Officer of BFIM |
| Steven West | First Vice President, Capital Transactions |
| Jill Whitney | Vice President, Fund Management (No Longer with BFIM) |
| Fund Managers | Listed Above |

Exhibit B

| | **Fern Hall Limited Partners' Privilege Log II** | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | Privilege Type | Date | Sender/Author | To | CC | BCC | Subject Matter | |
| 1 | AC/WP | 11/15/2017 | Mike Gladstone <Mike.Gladstone@bfim.com> | Ken Cutillo <Ken.Cutillo@bfim.com>; Marie Reynolds <Marie.Reynolds@bfim.com>; 'Andrew McB. Garvey (andrew.garvey@orix.com)' <andrew.garvey@orix.com>; 'Jerry Abrahams (Jerry.Abrahams@orix.com)' <Jerry.Abrahams@orix.com>; Greg Voyentzie <Greg.Voyentzie@bfim.com>; Jeff Rahn <Jeff.Rahn@bfim.com>; Edward Ronan <Edward.Ronan@bfim.com>; 'Ron K. Barger (ron.barger@orix.com)' <ron.barger@orix.com>; Nguyen, Cliff <Cliff.Nguyen@orix.com> | | | Email atttaching Executive Summary re: Douglas Litigation | |
| 2 | WP | 7/5/2018 | Gavin McLear <Gavin.McLear@bfim.com> | Sara Ahlander <Sara.Ahlander@bfim.com> | | | Email re: Portfolio Risk and Investment Management Committee Memorandum re: Fern Hall Valuation ("PRIM Memo")(prepared in anticipation of litigation in connection | |
| 3 | WP | 2/1/2018 | Edward Ronan | Capital Transaction Committee | | | Presentation re: Laurel Oaks Litigation | |
| 4 | WP | 2/1/2018 | Edward Ronan | Capital Transaction Committee | | | Presentation re: Magnolia Bay Litigation | |
| 5 | AC/WP | 9/6/2018 | Mike Gladstone <Mike.Gladstone@bfim.com> | Tami McKnew <Tami.McKnew@smithmoorelaw.com> | Jeff Rahn <Jeff.Rahn@bfim.com>/Stephen Rogers <Stephen.Rogers@bfim.com> | | Email with attachment re: Wellington Senior Apartments | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | AC | 9/6/2018 | Mike Gladstone <Mike.Gladstone@bfim.com> | Stephen Rogers <Stephen.Rogers@bfim.com> | Jeff Rahn <Jeff.Rahn@bfim.com> | | Email with attachment re: Wellington Senior Apartments | |
| 7 | AC | 9/6/2018 | Stephen Rogers <Stephen.Rogers@bfim.com> | Mike Gladstone <Mike.Gladstone@bfim.com> | | | Email with attachment re: Wellington Senior Apartments | |
| 8 | AC | 9/5/2018 | Stephen Rogers <Stephen.Rogers@bfim.com> | Mike Gladstone <Mike.Gladstone@bfim.com> | Jeff Rahn <Jeff.Rahn@bfim.com> | Stephen Rogers <Stephen.Rogers@bfim.com> | Email with attachment re: Wellington Senior Apartments | |
| 9 | AC | 4/25/2018 | Edward Ronan <Edward.Ronan@bfim.com> | Susan Donahue <Susan.Donahue@bfim.com> | | | Email with attachment re: Laurel Oaks | |
| 10 | AC/WP | 4/25/2018 | Edward Ronan <Edward.Ronan@bfim.com> | Susan Donahue <Susan.Donahue@bfim.com> | | | Email with attachment re: Magnolia Place | |
| 11 | WP | 9/5/2018 | Edward Ronan <Edward.Ronan@bfim.com> | Stephen Rogers <Stephen.Rogers@bfim.com> | | | Email with attachment re: Laurel Oaks | |
| 12 | AC/WP | 10/20/2017 | Edward Ronan | Capital Transaction Team | | | Report re: Magnolia Place and Laurel Oaks litigation | |
| 13 | AC/WP | 10/27/2017 | Edward Ronan | Capital Transaction Team | | | Report re: Magnolia Place and Laurel Oaks litigation | |
| 14 | AC | 12/4/2006 | Tom Louloudes<Tlouloudes@mmafin.com> | Scott Sergio | | | Email re: Fern Hall Due Diligence Checklist | Produced 4/10/20 |
| 15 | AC | 12/4/2006 | Scott Sergio <SSERGIO@nixonpeabody.com> | Tom Louloudes | | | Emaill re: Fern Hall Due Diligence Checklist | Produced 4/10/20 |
| 16 | AC | 12/11/2006 | Nixon Peabody | | | | Due Diligence Checklist for MMA Equity/MMA Debt: Fern Hall I with attorney notes | Produced 4/10/20 |

| 17 | AC | 12/20/2006 | Tom Louloudes | Scott Sergio | | | Email chain 12/18/2006 between T. Louloudes and Scott Sergio re: Fern Hall I | Produced 4/10/20 |
| | | | | | | | | |
| 18 | AC | 12/28/2006 | Nixon Peabody | | | | Fern Hall I Short Form Due Diligence Checklist with attorney notes | Produced 4/10/20 |
| | | | | | | | | |
| 19 | AC | 1/9/2007 | Forrest Milder <fmilder@nixonpeabody> | Scott Sergio | Arthur Hittner | | Email with attachment re: Fern Hall Phase I | Produced 4/10/20 |

Exhibit C

**Evans, Rebecca**

| | |
|---|---|
| **From:** | Karen E. Friedman <kfriedman@luriefriedman.com> |
| **Sent:** | Monday, April 20, 2020 7:15 AM |
| **To:** | Davenport, David; Hagstrom, Alexander M. |
| **Cc:** | Andrea L. Martin; David E. Lurie |
| **Subject:** | Fern Hall - Privilege Issues |
| **Attachments:** | FH.PrivilegeLogI.revised.pdf; FH.LP.Privilege LogII.revised.pdf |

Counsel -

The following supplements our responses of April 2, 2020 and April 10, 2020 to your letter of March 31, 2020 regarding the Limited Partners' Privilege Logs in the Fern Hall. As a preliminary matter, revised versions of both Logs are attached. The revised Logs number the identified documents, identify the author for Documents 26 and 28 on Log I, correct Entry 17 on Log II, note that the Nixon Peabody documents have been produced on Log II and, on Log I, add a list of the recipients of the emails at issue with their capacity/title at BFIM.

Your letter raised concerns regarding the Limited Partners' claims of attorney-client privilege and/or work product protection for the following documents:

I.     The CTT Reports, Cover Emails and Edward Ronan Email (Privilege Log I, Entries 3 and 21-34)

The CTT Reports (the "Reports") are a compilation of electronic entries containing information regarding the status of specific projects in which BFIM is invested. Each entry is written by an individual with responsibility for the project. The Reports are shared with employees of BFIM who also have supervisory responsibility for the projects or overall supervisory authority. The documents are marked and treated as confidential. The only entries on these Reports responsive to the General Partner's discovery requests are entries for the Magnolia and Laurel Oaks projects. Those entries are identified on the Privilege Log because they refer to Cushman & Wakefield and Philip Jones had prepared the appraisals of the limited partner interests in those projects. The cover emails contain no information responsive to the General Partner's discovery requests and are listed on the Privilege Log only to identify the senders and recipients of the Reports.

While each Report, as compiled, had multiple authors, all of the entries for the Magnolia and Laurel Oaks projects (including Entry 26 and 28) were written by Edward Ronan, who had specific responsibility for the Project as it entered Year 15. The first of these entries is dated June 26, 2017 and the last is dated September 15, 2017. In these entries, Mr. Ronan is reporting internally on the status of an evolving dispute with the General Partner regarding the valuation of the limited partner interests in the Magnolia and Laurel Oaks projects and, in the later entries, on the status of litigation filed in South Carolina as a result of that dispute. As reflected on the Privilege Log, Mr. Ronan was also involved in the progress of that litigation and participated in communications with South Carolina counsel and Mike Gladstone, BFIM's in-house and General Counsel. These entries were drafted in anticipation of litigation. By April 2017, BFIM had consulted with outside counsel for legal advice regarding its rights at the end of compliance under the Magnolia and Laurel Oaks partnership agreements. Mr. Ronan had had an acrimonious phone call with Drew Schaumber in early June regarding the relevance of capital accounts to the buyout price for the limited partner interests. BFIM had contacted and engaged local counsel in South Carolina by July 2017 in connection with this dispute. Litigation subsequently was filed in August 2017. In writing the entries for the Magnolia and Laurel Oaks projects, Mr. Ronan had reason to believe that litigation would ensue – as indeed, it did. See In re Grand Jury Subpoena, 220 F.R.D. 130, 148 (D. Mass. 2004). (while "anticipation" requires something more than a "mere remote possibility", a subjective belief that litigation was a real possibility and an objectively reasonable apprehension of litigation supports protection of the documents). Likewise, the email from Mr. Ronan to Jeff Rahn dated June 12, 2017 was written after BFIM had consulted with outside counsel and after Mr. Ronan's phone call with Mr. Schaumber.

While the Reports are routinely prepared in the ordinary course of business to keep the relevant officers and employees apprised of the status of certain projects, the entries specific to the Magnolia and Laurel Oaks projects were not drafted in the ordinary course of business. The entries contain the thoughts and mental impressions of BFIM with respect to its rights under the relevant partnership agreements and the valuation of its interests. See Bryan Corp. v. Chemwerth, 296 F.R.D. 31, 35 (D. Mass. 2013). They were prepared and written because litigation was anticipated and, in fact, ensued. The content for the Magnolia and Laurel Oaks entries would have been entirely different had there been no dispute. In the First Circuit, dual-purpose documents are protected by work product protection. Kellogg USA, Inc. v. B. Fernandez Hermanos, Inc., 269 F.R.D. 95, 100 (D.P.R. 2009). The protection applies "if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp., 649 F.3d 5, 31 n.4 (1st Cir. 2011). Work product does not lose protection merely because it is also "intended to inform a business decision influenced by the prospects of the litigation." Id. The fact that the Reports may also address valuation issues does not undermine the work product protection when the anticipated and actual legal dispute concerned BFIM's rights under the partnership agreement with respect to valuation of its interests.

Finally, the fact that the Reports were shared with multiple individuals within BFIM does not undermine its work product protection. Work product protection is not waived merely by disclosure to a third person but only when documents are used in a manner contrary to the doctrine's purpose. Bryan Corp., 296 F.R.D. at 38. "The purpose of the work product privilege is to protect information against opposing parties, rather than against all others outside a particular confidential relationship in order to encourage effective trial preparation… A disclosure made in pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents should be allowed without waiver of the privilege." Id. (internal citations omitted). Waiver occurs where the disclosure is made to an adversary or potential adversary. Id. (internal citations omitted).

The entries regarding the Magnolia and Laurel Oaks projects are also protected by the attorney-client privilege. They reflect BFIM's opinion of its legal rights and were provided to Mike Gladstone, in-house and General Counsel, who was actively engaged with South Carolina counsel in the litigation. The fact that the reports were sent to other officers and employees within BFIM does not undermine the privilege. They were not "disseminated beyond those persons who, because of the corporate structure, need to know its contents." See Tinian Sys., LLC v. Core Campus Columbia I, LLC, No. 3:15-CV-1102-JFA, 2016 WL 11643760, at *2 (D.S.C. Aug. 19, 2016).

Finally, the Magnolia and Laurel Oaks projects are not subject of this litigation and we reserve our objections regarding relevance, overbreadth, and burdensomeness.

II.      The PRIM Memorandum and Cover Emails (Log I, Entries 15-20; Log II, Entry 2)

The PRIM Memorandum was written by Stephen Rogers in June 2018 in anticipation of a dispute with Bradley Fern Hall I, LLC regarding the valuation of the Limited Partners' interests in the Fern Hall project. It specifically refers to an anticipated legal challenge. BFIM had good reason to believe it would be involved in litigation on the Fern Hall project given its earlier experience with the Magnolia and Laurel Oaks projects, the relationship between David Douglas and Bradley Queener and the DASH litigation in Washington. Within three months of preparation of this memo, BFIM had contacted our firm in connection with this case. Furthermore, it is protected as a "dual-purpose" document. It interprets specific language of the Partnership Agreement and addresses valuation issues within the context of the Limited Partners' legal rights under the Partnership Agreement. For the reasons stated above, the fact that it was sent to multiple officers and employees within BFIM does not undermine this protection. Finally, it is also protected by the attorney-client privilege as it was shared with in-house counsel and General Counsel who has been heavily involved in articulating the legal theories and opinions relevant to this case.

Please let me know if you would like to schedule a meet and confer to discuss these issues further. Also, please send us your privilege log or confirm that you have not withheld anything based on attorney-client privilege or work product protection.

2

Thank you.

Karen E. Friedman
Lurie Friedman LLP
One McKinley Square l Boston, MA 02109
T: 617.367.1970 l F: 617.367.1971
kfriedman@luriefriedman.com l www.luriefriedman.com



Exhibit D

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

| | | |
|---|---|---|
| _____ | ) | |
| MMA FERN HALL CROSSING LLC, and | ) | |
| BFIM SPECIAL LIMITED PARTNER, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-12486 |
| | ) | |
| BRADLEY-FERN HALL I, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<div align="center">

**AFFIDAVIT OF STEPHEN ROGERS IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

</div>

I, Stephen Rogers, hereby depose and state as follows:

1.      I am First Vice President at Boston Financial Investment Management, LP ("BFIM").  BFIM is the owner of BFIM Special Limited Partner, Inc., a plaintiff in this action, and provides management services to MMA Fern Hall Crossing, LLC, the other plaintiff in this action.  I submit this Affidavit in Support of Plaintiffs' Opposition to the Motion to Dismiss First Amended Complaint filed by the defendant in this action, Bradley-Fern Hall I, LLC.  This Affidavit is based on my personal knowledge.

2.      BFIM is a national leader in the low-income housing tax credit ("LIHTC") industry, and provides syndication services as well as asset and portfolio management.  BFIM works with investors and developers to make successful LIHTC investments in high quality assets that create affordable housing opportunities in urban and rural communities across the United States.  BFIM has invested billions of dollars in equity in LIHTC properties since 1986 and currently manages a $7.2 billion portfolio comprising over 1,165 properties and 103,000

units, making BFIM one of the largest and most experienced syndicators in the tax credit industry.

3.      My role within BFIM is Disposition Specialist within its Capital Transaction group. My primary responsibility is to manage BFIM's Investor Limited Partner and Special Limited Partner investments in various partnerships as they approach the end of the LIHTC compliance periods. In this capacity, it is my responsibility to understand the Limited Partners' rights as the compliance period nears and prepare for and manage BFIM's withdrawal from the partnerships at the appropriate time.

4.      MMA Fern Hall Crossing, LLC has been the investor limited partner (the "Investor Limited Partner") in the Fern Hall Limited Partnership (the "Partnership") since December 2006. BFIM Special Limited Partner, Inc. has been the special limited partner (the "Special Limited Partner") (together, the "Limited Partners").

5.      The Partnership is a single-purpose limited partnership the purpose of which is to construct, develop, operate, and manage a low-income housing development in South Carolina (the "Project"). The Project was developed to qualify for Federal Low-Income Housing Tax Credits pursuant to Section 42 of the Internal Revenue Code, 26 U.S.C. § 42. As such, the Project generated Federal tax credits for the Limited Partner and is subject to a 15-year Compliance Period which will expire this year on December 31, 2018.

6.      At the end of the Compliance Period, the Fern Hall partners have certain rights as described in the Limited Partnership Agreement (the "LPA"). The Investor Limited Partner has the right to force a sale of the Project "at any time" (the "Forced Sale Right"). LPA, Section 6.4J. Exercise of the Forced Sale Right leads to dissolution of the Partnership and requires distribution of Partnership assets in accordance with any positive balance in the Limited

Partners' capital accounts.  LPA, Article III.A and Section 10.2A (the "Liquidation Provision").

The Investor Limited Partner's capital account in this case has a positive balance.

7.      In addition, the General Partner has the right to buy out the Limited Partners'

interests in the Partnership for one year following the end of the Compliance Period.  LPA,

Section 6.13 (the "Option").  The Option may be exercised only on written notice which must

include an appraisal of the fair market value of the Investor Limited Partner's interest in the

Partnership.  Id., Sections 6.13C(ii)(2); 6.13D.

8.      For the purposes of determining the fair market value of the Limited Partners'

interests, the appraiser is directed to consider the value of the assets of the Partnership.  The

appraiser must also "give due consideration to all other relevant factors" relating to the value of

those interests including the Investor Limited Partner's ability to require liquidation.  Id., Section

6.13E(iv).

9.      The Forced Sale Right and the Option are simultaneous rights. Therefore, in

determining the fair market value of the Investor Limited Partner's interest for the purposes of

the General Partner's exercise of the Option, the appraiser must give due consideration to the

Investor Limited Partner's ability to force a sale which would lead to liquidation and distribution

of Partnership assets in accordance with the positive balances in the capital accounts.

10.      In anticipation of the end of the Compliance Period, the attorney for the managing

member of the General Partner contacted me, informing me that her client, Bradley Queener,

wanted to discuss a potential buy-out by the General Partner of the Limited Partners' interests.

The discussion involved Mr. Queener's right at the end of the compliance period to purchase the

Limited Partners' interests; his desire to start the process early; and to proceed in a less formal

manner in order to limit costs.  I informed Mr. Queener's counsel that BFIM could accommodate
the request and that I would reach out to him directly.

11.     During the initial conversation with Mr. Queener, he indicated that he intended to
exercise the General Partner's Option upon expiration of the Compliance Period.  However, in
the course of our discussions regarding the Option price, it became apparent that we had a
significant disagreement with respect to interpretation of the LPA regarding whether the Limited
Partners' capital accounts have to be taken into account in determining the fair market value of
their partnership interests.

12.     I maintained that any valuation of the Investor Limited Partner's interest must
consider its positive capital account as required by the Liquidation Provision.

13.     Mr. Queener, on the other hand, claimed that the fair market value of the Investor
Limited Partner's interest should be determined as if a "Capital Transaction" prior to dissolution
had occurred with proceeds distributed according to Section 10.1B of the LPA (the "Waterfall
Provision").  The Waterfall Provision makes no reference to the Investor Limited Partner's
capital accounts.  Instead, it distributes 90% of the available proceeds from the transaction to the
General Partner but only 10% of the proceeds to the Investor Limited Partner.  Mr. Queener
insisted that the fair market value of the Investor Limited Partner's interest would not reflect the
balance in its capital account.  Mr. Queener indicated he would discuss BFIM's conclusion with
his attorneys, Attorneys Scogin and Davenport, and determine next steps.

14.     In an email dated October 3, 2018, Mr. Queener forwarded an email from his
attorney, in which his attorney maintained that the value of the Investor Limited Partner's
interest would be calculated based on the Waterfall, not the Liquidation Provision.  The attorney
recommended that "if you are unable to reach an agreement on a purchase price with [BFIM],

next step will be to bring in Davenport to proceed to enforce your rights under the [LPA]".  We were aware that Attorney Davenport, who represents the General Partner in this action, was a litigator who had represented associates of Mr. Queener in the past and that this indicated Mr. Queener was considering filing suit on this matter regarding his rights under the LPA.

15.     I responded with an email on October 19, 2018 in which I indicated an interest in attempting to resolve the matter but reiterated BFIM's position that calculation of the fair market value of the Investor Limited Partner's interest must take into account its positive capital account.

16.     Mr. Queener responded on October 24, 2018 and forwarded another email from his attorney again disputing the Limited Partners' interpretation of the LPA.  The attorney recommended that Mr. Queener "take legal action to seek an interpretation of the [LPA]" if he could not reach an agreement with the Limited Partners on a purchase price by November 15, 2018 or thereabouts.  In addition, she asked Mr. Queener to provide:

> some days/times you are available next week and I will set up a call with Davenport to update him on status.  Given the short time frame, I think we need to loop him back in now in case you are unable to reach an agreement on price.

We understood the attorney's request to set up a call and the reference to a "short time frame" as a clear sign that the General Partner intended to file suit regarding interpretation of the LPA if the matter could not be resolved to Mr. Queener's satisfaction.  Our email exchange is attached to this Affidavit as Exhibit A.

17.     In a subsequent telephone call and my last communication with Mr. Queener on November 6, 2018, he unequivocally rejected the Limited Partners' interpretation of the LPA. He stated that there was nothing more to discuss, that the Limited Partners had no chance of winning on this issue and that when the General Partner prevailed, he would gladly accept a

check from BFIM for his attorney's fees. Mr. Queener also said he would consult with his attorneys, including Attorney Davenport, regarding next steps. He made it clear that paying the Investor Limited Partner anything close to the value of its capital account was not a consideration under his interpretation of the LPA.

18.     Given the intractable nature of the interpretive dispute with respect to determining the fair market value of the Investor Limited Partner's interest under the LPA and the General Partner's statement that there was nothing more to discuss and the explicit threat to pursue litigation, the Limited Partners filed suit in Massachusetts state court as provided under the LPA seeking a declaration of the parties' rights under the LPA. LPA, Section 13.7D.

19.     In light of the parties' dispute as to whether the Option price should reflect the Investor Limited Partner's positive capital account, the Limited Partners intend to exercise their Forced Sale Right immediately after the end of the Compliance Period in order to ensure that they receive the value of those accounts.

Signed this 20th day of December under the penalties of perjury.


/s/ Stephen Rogers
STEPHEN ROGERS


**CERTIFICATE OF SERVICE**

I, Karen E. Friedman, hereby certify that this document filed through the CM/ECF system be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 20, 2018.


/s/ Karen E. Friedman
Karen E. Friedman (BBO #548943)


6

# Exhibit A

**From:** Brad Queener [mailto:brad@bradleydevelopers.com]
**Sent:** Wednesday, October 24, 2018 3:19 PM
**To:** Stephen Rogers <Stephen.Rogers@bfim.com>
**Subject:** Fwd: Fern Hall

Stephen -

Hope all is well.  Please see response below.  Let's have a call and see if we can resolve.

Thank you,
Brad


Begin forwarded message:

**From:** "Scogin, Carolyn W." <CWS@blancolaw.com>
**Subject: RE: Fern Hall**
**Date:** October 23, 2018 at 8:50:24 PM EDT
**To:** 'Brad Queener' <brad@bradleydevelopers.com>
**Cc:** "Scogin, Carolyn W." <CWS@blancolaw.com>

Brad, the position that BF is taking below on the forced sale is in direct opposition to the position that was taken by BF on Plantation.  When the buyer of your Plantation interest requested that BF clarify 6.4J/6.13, BF's response was that  6.4J and 6.13 did not conflict and that it was inherent in the OPA language that 6.4(J) was "subject to the terms and conditions of 6.13."   At the end of the day, the buyer on Plantation requested and BF granted a 30 day notice period, but this notice period does not make a material difference.  I recommend you take legal action to seek an interpretation of the OPA if you cannot reach an agreement with BF on a purchase price by around 11/15/18.  Let me know some days/times you are available next week and I will set up a call with Davenport to update him on status.  Given the short time frame, I think we need to loop him back in incase you are unable to reach an agreement on price.  Thanks.



**Carolyn W. Scogin**
Attorney at Law
cws@blancolaw.com
Bio | vCard
Main: 336.293.9000
Direct: 336.293.9063
Mobile: 336.918.6815
Fax: 336.293.9030

P.O. Drawer 25008 ● Winston-Salem ● NC ● 27114-5008
110 South Stratford Road, Suite 500 ● Winston-Salem ● NC ● 27104-4299

Electronic communications may be intercepted or altered, so the integrity of this message and any attachments cannot be guaranteed. This email contains confidential information for the intended recipient(s) and may be privileged under the attorney-client relationship. If you are not the intended recipient, any reading, distribution, copying, or other use of this communication is prohibited. If you received this email in error, please notify the sender by reply email or by phone at 336-293-9000 and destroy the communication without disclosing the contents.

**From:** Brad Queener [mailto:brad@bradleydevelopers.com]
**Sent:** Friday, October 19, 2018 2:39 PM
**To:** Scogin, Carolyn W.
**Subject:** Fwd: Fern Hall

www.bradleydevelopers.com

Begin forwarded message:

> **From:** Stephen Rogers <Stephen.Rogers@bfim.com>
> **Date:** October 19, 2018 at 2:34:41 PM EDT
> **To:** Brad Queener <brad@bradleydevelopers.com>
> **Subject: RE: Fern Hall**
>
> Brad,
>   Thank you for your patience.  BFIM has re-reviewed Fern Hall's Partnership document and we disagree with your attorney's conclusion.  The language of the Plantation Agreement and the language of the Fern Hall agreement are very different.  Under the Plantation Agreement, the Investor Member may not exercise its forced sale right for the first year after the Compliance Period unless it gives the Managing Member notice and 30 days to exercise its option to purchase.  There is no language likes this in the Fern Hall LPA.  The Investor Limited Partner's forced sale right and the buyout option are simultaneous rights and the Investor Limited Partner may exercise its forced sale right "at any time."  Therefore, we conclude that the liquidation provision applies and the fair market value calculation to determine the Buyout Price must consider the Investor Limited Partner's capital account.  Section 6.13E(iv) directs the appraiser to consider the Investor Limited Partner's ability to require liquidation in determining the value of the interests.  BFIM concludes that Section 6.4J provides the Investor Limited Partner this ability; to direct a sale of the property which would result in a liquidation

event.  That ability to require liquidation would result in liquidation proceeds for the Parties which the appraiser must properly allocate according to capital accounts.

Despite the difference in our interpretations of the relevant LPA provisions, I remain hopeful that we can achieve a resolution of this matter.  We look forward to your thoughts regarding our interpretation of the contract language.

Regards,
Steve

**Stephen Rogers | First Vice President | Capital Transactions**
Boston Financial Investment Management, LP | 101 Arch Street | Boston, MA 02110
(P) 617-488-3273 | (C) 781-724-2908
stephen.rogers@bfim.com | www.bfim.com

**From:** Brad Queener [mailto:brad@bradleydevelopers.com]
**Sent:** Thursday, October 04, 2018 3:23 PM
**To:** Stephen Rogers <Stephen.Rogers@bfim.com>
**Subject:** Re: Fern Hall

Sounds good.  Thank you.

> On Oct 4, 2018, at 3:21 PM, Stephen Rogers
> <Stephen.Rogers@bfim.com> wrote:
>
> Brad,
>   Thank you for your response, including Carrie's assessment.  I need a few days.  I need to discuss internally and with counsel.  Thank you for your patience.
>
> Regards,
> Steve
>
> **Stephen Rogers | First Vice President | Capital Transactions**
> Boston Financial Investment Management, LP | 101 Arch Street | Boston, MA 02110
> (P) 617-488-3273 | (C) 781-724-2908
> stephen.rogers@bfim.com | www.bfim.com
>
> **From:** Brad Queener [mailto:brad@bradleydevelopers.com]
> **Sent:** Wednesday, October 03, 2018 3:13 PM
> **To:** Stephen Rogers <Stephen.Rogers@bfim.com>
> **Cc:** Brad Queener <brad@bradleydevelopers.com>
> **Subject:** Fwd: Fern Hall
>
> Stephen -

Hope all is well with you.  I have spoken with my attorney (see below) and we believe that the position the BF is taking is incorrect and are confident that we would prevail legally if forced to do so.  As I mentioned on our call, it is my hope that we can avoid this.   Look forward to speaking with you on this, let me know when you are available to discuss.

Thanks,
Brad


Begin forwarded message:

**From:** "Scogin, Carolyn W."
<CWS@blancolaw.com>
**Subject: Fern Hall**
**Date:** October 2, 2018 at 5:09:15 PM EDT
**To:** 'Brad Queener'
<brad@bradleydevelopers.com>

Brad, following up on our conversation, I understand BF is taking the position that capital accounts come into play with calculation of the purchase price of the investor interest on Fern Hall.  That is not correct.  Under the Fern Hall OPA,  the value of the investor's interest would be calculated based on the "Capital Transaction" waterfall, not liquidation.  The language in Fern Hall is the same language favorable to the managing member that  BF sought to "clarify" when you sold your interest in Planation Apartments.  As you know, the purchaser of your interest in Plantation Apartments did not accept BF's proposed amendment to modify the back-end provisions (because the OPA language, same as language in Fern Hall, was beneficial to the managing member).  Fern Hall also has identical language to several of the projects that you have discussed with David Douglas and Drew Schaumber, and that have been reviewed by David Davenport.  If you are unable to reach an agreement on a purchase price with BF, next step will be to bring in Davenport to proceed to enforce your rights under the OPA.   Please let me know if you have any additional questions at this point.  Thanks.

**Carolyn W. Scogin**
Attorney at Law
cws@blancolaw.com
Bio | vCard
Main: 336.293.9000
Direct: 336.293.9063
Mobile: 336.918.6815
Fax: 336.293.9030

P.O. Drawer 25008 • Winston-Salem • NC • 27114-5008
110 South Stratford Road, Suite 500 • Winston-Salem • NC • 27104-4299

Electronic communications may be intercepted or altered, so the integrity of this message and any attachments cannot be guaranteed. This email contains confidential information for the intended recipient(s) and may be privileged under the attorney-client relationship. If you are not the intended recipient, any reading, distribution, copying, or other use of this communication is prohibited. If you received this email in error, please notify the sender by reply email or by phone at 336-293-9000 and destroy the communication without disclosing the contents.

Exhibit E

Volume I
Pages 1 to 161
Exhibits 30 to 47

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
BRADLEY-FERN HALL I, LLC,        :
            Plaintiff,           :
                                 :
        vs.                      :   C.A. No.
                                 :   1:19-cv-11181-DPW
MMA FERN HALL CROSSING LLC,      :
and BFIM SPECIAL LIMITED         :
PARTNER, INC.,                   :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF MMA FERN HALL CROSSING LLC,
THROUGH ITS DESIGNEE STEPHEN ROGERS, AND STEPHEN
ROGERS INDIVIDUALLY, a witness called by counsel for
the Plaintiff, taken pursuant to the Federal Rules
of Civil Procedure, before Ken A. DiFraia,
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Burns & Levinson LLP, 125 High Street,
Boston, Massachusetts, on Friday, March 13, 2020,
commencing at 9:30 a.m.

PRESENT:

    Winthrop & Weinstine, P.A.
        (by David A. Davenport, Esq.)
        225 South 6th Street, Suite 3500,
        Minneapolis, MN 55402,
        ddavenport@winthrop.com
        612.604.6716
        for the Plaintiff.


(Continued on Next Page)

```
 1                    E X H I B I T S, Continued
 2    NO.          DESCRIPTION              PAGE
 3    Exhibit 43  Copy of spreadsheet analysis   134
                  labeled "Capital Transactions
 4                Committee Presentation," for
                  Fund ITC 32, Bates
 5                Nos. BFIM005181-005187
 6    Exhibit 44  Copy of Buyout Notice          152
                  concerning Laurel Oaks from
 7                Douglas Company
 8    Exhibit 45  Copy of Buyout Notice          153
                  concerning Magnolia Place
 9                Apartments LP from Douglas
                  Company
10
      Exhibit 46  Copy of Buyout Notice          154
11                concerning Wellington Senior
                  Apartments from Douglas Company
12
      Exhibit 47  Copy of email exchange between  154
13                Stephen Rogers and Drew
                  Schaumber regarding Oaks of
14                Wellington
15
16                         * * * *
17
18
19
20
21
22
23
24
```

```
 1                 P R O C E E D I N G S
 2         MS. FRIEDMAN:  The same stipulations that
 3    we have agreed to?
 4         MR. DAVENPORT:  Yes, the same stipulations.
 5                   STEPHEN ROGERS
 6    a witness called for examination by counsel for the
 7    Plaintiff, having been satisfactorily identified by
 8    the production of his driver's license and being
 9    first duly sworn by the Notary Public, was examined
10    and testified as follows:
11              DIRECT EXAMINATION
12    BY MR. DAVENPORT:
13         Q.  Sir, could you state your name for the
14    record.
15         A.  Stephen Rogers.
16         Q.  And what is your address?
17         A.  45 Ivy Road in Weymouth, Mass.
18         Q.  Where do you work?
19         A.  Boston Financial Investment Management.
20         Q.  Have you ever been deposed before?
21         A.  I have not.
22         Q.  You were here throughout the deposition
23    yesterday, right?
24         A.  Correct.
```

```
 1         Q.  So it generally works the same way.  I will
 2    be asking you a series of questions throughout the
 3    day.  If you answer, we will assume that you
 4    understood the question when you answered it; is
 5    that fair?
 6         A.  That's fair.
 7         Q.  And you probably know this.  Oftentimes
 8    when I ask a question, I may be looking out the
 9    window, looking down or taking notes and not looking
10    at you.  I don't mean any disrespect, okay?
11         A.  Sure.
12         Q.  If you need to take a break, let me know.
13    We will try to get to a natural stopping point and
14    let you do that.
15              What did you do to prepare for the
16    deposition today?
17         A.  I met with counsel.  Then, among things, I
18    reviewed a series of documents.  I reviewed the
19    Partnership Agreement, the Investment Committee
20    package from the original investment, and then I
21    refamiliarized myself with the buyout option and
22    subsequent materials.
23         Q.  Are there any other documents you recall
24    reviewing?
```

```
 1         A.  No.
 2         Q.  Do you go by Steve or Stephen, or both?
 3         A.  Steve is fine.
 4         Q.  I will try to call you "Mr. Rogers."
 5         A.  Some folks call me "Captain America."
 6             (Discussion off the record)
 7         Q.  How long have you been employed at Boston
 8    Financial Investment Management?
 9         A.  Just over 15 years.
10         Q.  What is your title?
11         A.  First vice president.
12         Q.  Just vice president, or is it affiliated
13    with a department?
14         A.  Yes.  So I work in the capital transactions
15    group as a dispositions specialist.
16         Q.  When you say "first vice president," was
17    that the first title you held at Boston Financial,
18    or is that your current title?
19         A.  Current title.
20         Q.  So vice president, and you work in the
21    capital transactions group as a what?
22         A.  Dispositions specialist.
23         Q.  How long have you held that position?
24         A.  I've been in that department for five years.
```

1    Q.  Prior to that, what was your role at Boston
2  Financial Investment Management?
3    A.  I was a fund manager.
4    Q.  How long were you a fund manager?
5    A.  The same, five years.
6    Q.  Prior to that, what was your role at Boston
7  Financial?
8    A.  I was in the production department or
9  syndication department.  Investor relations.
10    Q.  How long were you in that role?
11    A.  That was five years as well.
12    Q.  So you've been in the capital transactions
13  group about five years?
14    A.  Correct.
15    Q.  So is it time to move to a different group
16  now?  You do it every five years?
17      Talk to me about the production department,
18  syndication, investor relations.  What generally
19  does that involve?
20    A.  So that involves -- the side of the
21  department I worked on involves identifying
22  investors for these investments and then compiling
23  properties or investments sufficient for a
24  particular fund.  So I worked in a department or

1  section of the department specific to guaranteed
2  funds.  So the properties that I would look at were
3  earmarked for guaranteed funds.
4    Q.  What is a guaranteed fund?
5    A.  So it's very similar to the fund structure
6  that we were talking about yesterday as it relates
7  to ITC 32, but then we would guarantee the return or
8  guarantee the yield to the investor.
9    Q.  So similar structure to a LIHTC investment
10  fund but different investments?
11    A.  Well, same investment, same project
12  partnership type investments, but for one reason or
13  another they may have been better suited for a
14  guaranteed fund, so they were placed in a guaranteed
15  fund as opposed to an unguaranteed multi-investor
16  ITC 32 fund.
17    Q.  So ITC 32 is not a guaranteed fund,
18  correct?
19    A.  Correct.
20    Q.  Prior to working at Boston Financial
21  Investment Management, where were you employed?
22    A.  A group called KBS Realty Advisors.
23    Q.  Is that here in the Boston area?
24    A.  It was.  It's no longer.  It was a Newport

1  Beach, California based company with an office in
2  Boston.  That Boston office is no longer here.
3    Q.  Did it somehow become affiliated with
4  Boston Financial Investment Management?
5    A.  No.
6    Q.  Did it shut down?
7    A.  No.  It was a conventional real estate
8  group.  It worked on completely different investment
9  types.  I just max-ed out.  I was beyond my
10  five-year period, so...
11    Q.  So you basically left your employment there
12  to join Boston Financial?
13    A.  Yes.
14    Q.  You never worked for MMA Financial; is that
15  right?
16    A.  No.  I did work for MMA Financial because
17  Boston Financial purchased the investments of MMA
18  Financial back in 2009.  I started my employment
19  with its predecessor, MMA Financial, in 2005.
20    Q.  So BFIM acquired MMA Financial in 2009?
21    A.  BFIM acquired the assets of MMA Financial
22  in 2009, correct.
23    Q.  So in 2005 roughly, is that when you
24  started working at MMA Financial?

1    A.  Correct.
2    Q.  And then when Boston Financial acquired the
3  assets of MMA Financial, you then became an employee
4  of Boston Financial; is that right?
5    A.  Correct.
6    Q.  So roughly 2009?  I think you said 2009,
7  right?
8    A.  Yes.
9    Q.  Okay.  Got it.  When Fund 32 was being
10  formed, were you involved?
11    A.  No.
12    Q.  Were you involved in any of the syndication
13  relating to Fund 32?
14    A.  I was not.
15    Q.  Fund 32, was it fully capitalized by the
16  time you had any involvement with it?
17      MS. FRIEDMAN:  Objection.
18    A.  So I don't have direct involvement in
19  ITC 32.  I have involvement in the project
20  partnerships that ITC 32 is invested in.
21    Q.  When did that involvement with those
22  project partnerships in Fund 32 begin?
23    A.  So in my role in capital transactions, from
24  memory, I'm going to say that Fern Hall is likely

Page 13

1  the first investment in ITC 32 that I've been
2  involved in.
3       Q.  Got it.  So you were a fund manager.  Did
4  you manage Fund 32?
5       A.  I did not.
6       Q.  What did you do as a fund manager?
7       A.  So as a fund manager, my primary
8  responsibility was providing reports to investors,
9  essentially basically managing the benefits of the
10  fund, then communicating fund performance to the
11  investors.
12       Q.  And fund benefits include tax credits?
13       A.  Correct.
14       Q.  Allocation of losses?
15       A.  Yes.
16       Q.  And to the extent there's cash being
17  distributed, is that also one of the benefits of the
18  fund?
19       A.  Yes.
20       Q.  So understanding that you didn't manage
21  Fund 32, did you manage funds like it?
22       A.  Yes.
23       Q.  So you began working in the capital
24  transactions group around 2015; is that right?

Page 14

1       A.  Correct.
2       Q.  And at or about that time, that's when you
3  first had involvement with Fern Hall?
4       A.  No.
5       Q.  When did you first have involvement with
6  Fern Hall?
7       A.  Probably in the 2017, 2018 range.
8       Q.  So a couple of years or so after you began
9  working in the capital transactions group?
10       A.  Yes.
11       Q.  Is that because you were assigned to work
12  on Fund 32 related transactions for project
13  partnerships that are nearing Year 15?
14       A.  Not exactly.
15       Q.  How was it that you came to have
16  involvement with Fern Hall?
17       A.  So properties are assigned to a
18  dispositions specialist by the department manager.
19       Q.  So it's not the case that you are
20  responsible for all of the properties within
21  Fund 32?
22       A.  Correct.
23       Q.  Who was it that assigned you the
24  responsibility to work on matters related to Fern

Page 15

1  Hall?
2       A.  That would be Jeff Rahn.
3       Q.  What is his title, do you know?
4       A.  He's an executive vice president.  I'm not
5  sure what his business title is specifically.  As it
6  relates to my dispositions specialist, I don't know
7  what his title is.
8       Q.  Sorry, I didn't get it down.  You said
9  properties are assigned by who?  I know it was Jeff
10  that did it, but is there a title?  Fund manager?
11       A.  Department manager.
12       Q.  Department manager.  Thank you.  Do you
13  know what department Mr. Rahn manages?
14       A.  The dispositions department within capital
15  transactions.
16       Q.  How many other departments are there within
17  the capital transactions group?
18       A.  How many others?  Two.
19       Q.  What are they?
20       A.  There's a workout group.  Then there's the
21  legal.
22       Q.  The what?
23       A.  Legal group.
24       Q.  Legal?

Page 16

1       A.  Yes.
2       Q.  So the capital transactions group has three
3  departments:  The dispositions department, the
4  workout department, and the legal group department?
5       A.  Correct.
6       Q.  What, if you know, is the general function
7  of the workout group?
8       A.  So, the workout folks, they are assigned to
9  properties as they are identified as problematic.
10       Q.  Underperforming assets perhaps?
11       A.  Correct.  That would be one example.
12       Q.  Do you know if there's some sort of policy
13  by which properties are assigned to dispositions
14  specialists like yourself by the department manager?
15       A.  I am not aware of a policy.
16       Q.  When you are assigned a property, is it
17  typically close to the end of the 15-year compliance
18  period?
19       A.  No.  It's usually -- it could be as early
20  as five years before.
21       Q.  Do you typically get assigned to a property
22  after the end of the 10-year credit period?
23       A.  That happens.
24       Q.  Do you get assigned to work on properties

Page 17

1  prior to the end of the 10-year credit period?
2      A.  Can I qualify that answer?
3      Q.  Sure.
4      A.  Not normally, but currently it's happening.
5  And I say that because recent in transactions
6  general partners are inserting put options in
7  Year 11, so there are times I would be assigned to a
8  property prior to Year 10 in preparation of that
9  option.
10     Q.  So with respect to fund project
11 partnerships like the vintage of Fern Hall where
12 there's no put option, would it generally be the
13 case that you are assigned to work on those after
14 the end of the 10-year credit period?
15     A.  Yes.
16     Q.  What is the general role of the
17 dispositions group?
18     A.  So the role is to manage and execute a
19 limited partner's withdrawal from a local
20 partnership, from a project partnership.
21     Q.  Is it generally the case that in that role
22 limited partners desire their withdrawal from a
23 partnership in Year 16?
24        MS. FRIEDMAN:  Objection.

Page 18

1      A.  At times.
2      Q.  Is it generally the case that limited
3  partners prefer not to withdraw prior to the end of
4  the compliance period?
5      A.  Can you repeat the question.
6      Q.  Is it generally the case that limited
7  partners prefer not to withdraw prior to the end of
8  the compliance period?
9        MS. FRIEDMAN:  Objection.
10     A.  I don't think that's a preference any longer.
11     Q.  Was it once a preference?
12     A.  I don't know if it was a preference.  It
13 wasn't a practice as it is today.
14     Q.  Understanding that distinction you just
15 made as far as a change in practice, how long ago
16 did that change?
17     A.  So I'm going to say about, say, 2016, 2017
18 is the time frame where we started exiting
19 partnerships prior to the end of Year 15 and
20 investors became comfortable with that.
21     Q.  How many dispositions on average do you
22 think you execute in a given year?  Let's use 2019
23 as an example.
24     A.  Okay.  12 to 15.

Page 19

1      Q.  Is that roughly the same estimate you would
2  give for 2018?
3      A.  Yes.
4      Q.  If you execute a limited partner withdrawal
5  from a project partnership prior to the end of the
6  compliance period, are there certain protections
7  that you would like to have in place for the limited
8  partner?
9      A.  Yes.
10     Q.  What are they?
11     A.  We require a post transfer compliance
12 guarantee.
13     Q.  What is that?
14     A.  So we are requiring, or we require, a
15 guarantee against the recapture of credits.
16     Q.  Anything else other than requiring that
17 post transfer compliance guarantee?
18     A.  No.
19     Q.  Is that essentially a guarantee that
20 protects the limited partner in the event of a
21 recapture?
22     A.  Yes.
23     Q.  Why would that be important?
24     A.  Because the investors purchased tax

Page 20

1  credits.  They receive those tax credits over a
2  period of ten years.  So if they were to withdraw
3  from a partnership before Year 15, they are at risk
4  of recapture, and nobody wants to receive that
5  notice from the IRS.
6      Q.  And after the end of the compliance period,
7  is that risk of recapture gone?
8      A.  Yes.
9      Q.  What do you understand recapture to be?
10     A.  I understand recapture to be a penalty, if
11 you will, an investor essentially refunding the
12 Government the tax credits that they received if
13 their project falls out of compliance.
14     Q.  And if the project falls out of compliance
15 after the end of the 15-year compliance period, is
16 it your understanding then that the IRS would not be
17 able to come in and effect a recapture?
18     A.  It's my understanding that there is a
19 three-year audit window, if you will.
20     Q.  What is that?
21     A.  So the IRS has an ability to examine the
22 books and records within the past three years, and
23 if they were to audit the property's books and
24 determined that that that property was out of

## Page 53

1  that.
2      Q.  And that ultimately results in the sale of
3  the property?
4      A.  Yes.
5      Q.  And a disposition is either a fee simple
6  sale of the project or a sale of the limited partner
7  interests in the partnership, correct?
8      A.  Yes.
9      Q.  So one of those events back in 2009 was
10 projected to occur two years after what the
11 compliance period was identified here?
12     A.  Correct.
13     Q.  And then the net projected residual
14 proceeds to the fund, that would be what was
15 projected at that time to follow whatever the
16 disposition might be, correct?
17     A.  Correct.
18     Q.  Whether it was a sale of the project or a
19 transfer of the limited partner interest in the
20 partnership, the net projected residual proceeds to
21 the fund was zero dollars, right?
22     A.  Correct.
23     Q.  And there's a Footnote No. 3 associated
24 with net projected residual proceeds to the fund, do

## Page 54

1  you see that?
2      A.  I do.
3      Q.  Can you read what that says?
4      A.  It says, "Net residual proceeds to fund
5  from fund management residual proceeds analysis,"
6  and in the parenthesis it says, "performed," and
7  does that say 6?  Is it dash 06?  I don't know.  I
8  can't tell.
9      Q.  Is it 605?
10     A.  I don't know.
11     Q.  It's hard to tell?
12     A.  It is hard to tell.
13     Q.  Is it fair to say that the footnote is
14 referencing some residual proceeds analysis that was
15 performed that identified zero dollars of net
16 projected residual proceeds?
17     MS. FRIEDMAN:  Objection.
18     A.  Yes.
19     Q.  On the next page, you will see more
20 information relating to Fern Hall?
21     A.  Uh-huh.
22     Q.  There's a column Cumulative Received, do
23 you see that?
24     A.  I see it, yes.

## Page 55

1      Q.  Do you know what that is intended to reflect?
2      A.  It's intended to reflect the cash
3  distributions received by that property through --
4  it appears to be through the end of 2008.
5      Q.  And there's a Footnote No. 4 on the
6  preceding page that we just looked at.  Do you know
7  what that says?
8      A.  I can't make out the second word.  So
9  "Residual" something "fund management override?
10 Denotes properties which for the standard residual
11 analysis calculation was adjusted by fund
12 management."
13     Q.  Do you know what that is referring to?
14     A.  It's referring to an ability of the fund
15 manager to override the residual projection coming
16 from Prism.
17     Q.  Then at the top there, we talked about the
18 net projected residual proceeds.  Then there's the
19 "Disposition projection per CTT or residual?"  Do
20 you see that?
21     A.  I do.
22     Q.  Do you know what that relates to?
23     A.  Yes.
24     Q.  What?

## Page 56

1      A.  Capital transaction has the ability to
2  override the residual projection as well.
3      Q.  And there's nothing identified in the line
4  item associated with that column for Fern Hall; is
5  that right?
6      A.  That's correct.  Recognizing that we are
7  three years into the deal and far away from end of
8  compliance, yes.
9      Q.  So this payment deals with disposition
10 residual proceeds.
11     The next page, 5885 in
12 Exhibit 30, is the distribution projections?
13     A.  Yes.
14     Q.  The next page, 5886, is the Legal/
15 Consulting Projections?
16     A.  Yes.
17     Q.  Do you know what -- what is this?
18     A.  Sure.  It's a category or line item, if you
19 will, that tracks actual amounts paid for legal/
20 consulting and then provides a projection for future
21 legal and consulting projections.  Consulting would
22 be if we were to order a valuation on a particular
23 property.
24     Q.  Would it then be allocated equally across

Page 73

1     A.  Yes, it is.
2     Q.  We can go back and look at this spreadsheet
3  (indicating).  It's similar to the one we just
4  looked at, but it's just for a different year,
5  right, prepared roughly a year later?
6     A.  It does have similar information on it, yes.
7     Q.  So Page 8921 shows proceeds to fund source,
8  right?
9     A.  Yes.
10    Q.  And for Fern Hall on the next page, it
11 says, "PNSP," right?
12    A.  It does.
13    Q.  Is that essentially a link that you click
14 on, PNSP, and it takes you to another screen?
15    A.  No.  So similar to the ratings we talked
16 about briefly for Properties A through D, so Prism
17 has this sort of, for lack of a better term, rating
18 system, and it does a calculation or a lookup, if
19 you will, of various amounts in various columns,
20 measures those amounts against one another and
21 determines what the source of proceeds to the fund
22 is going to be.  That source would be either PNSP,
23 as you see here, tax capital balance, or TCB, and
24 then the waterfall, WF.  So essentially there's four

Page 74

1  ratings for where the proceeds are coming from.  I
2  have given you three.  PNSP, TCB, WF, and then the
3  final one would be CTT.  That would be an override
4  by a capital transactions dispositions person.
5     Q.  So this spreadsheet is projecting a
6  potential disposition of the project, the Fern Hall
7  project, in 2020, correct?
8     A.  That's correct.
9     Q.  And it's projecting if these circumstances
10 occur at that time, the projected positive capital
11 account of the limited partner would be $747,970,
12 right?
13    A.  That's right.
14    Q.  And then it's projecting if the disposition
15 occurred in 2020, the potential net sales proceeds
16 would be $267,873, correct?
17    A.  That's correct.
18    Q.  And it is also projecting if that were to
19 occur, proceeds to the fund via the Fern Hall
20 Partnership Agreement would result in $25,777 in
21 proceeds to the fund, right?
22       MS. FRIEDMAN:  Objection.
23    A.  Could you rephrase that.
24    Q.  Sure.  We are looking at Proceeds to Fund

Page 75

1  via Waterfall, right?
2     A.  I see that, yes.
3     Q.  So if there is a disposition in 2020, based
4  on the circumstances modeled here, the proceeds to
5  the fund via the waterfall would be 25,777, correct?
6       MS. FRIEDMAN:  Objection.
7     A.  The calculated amount in Prism of the
8  waterfall value is 25,777, but that is not what is
9  projected to come up from this property.
10    Q.  Understood, but in terms of what would be
11 coming the waterfall, it's $25,000?
12       MS. FRIEDMAN:  Objection.
13    A.  Correct.
14    Q.  And that is referencing the waterfall in
15 the Fern Hall Apartment -- the Fern Hall Partnership
16 Agreement, right?
17    A.  That's correct.
18    Q.  Similar to the exhibit we just looked at
19 for Exhibit 32 when it said, "via the waterfall,"
20 it's referring specifically to the Fern Hall Project
21 Partnership Agreement, right?
22    A.  That's right.
23    Q.  And that waterfall that's being referred to
24 there, I think you said that's 10 percent, right?

Page 76

1     A.  That's correct.
2     Q.  And that waterfall is 10.1B of the Fern
3  Hall Partnership Agreement, correct?
4     A.  That is correct.
5     Q.  This calculates that the proceeds available
6  from a sale would be 267,873, which is also short of
7  the capital account projected at that time, correct?
8     A.  That's correct.
9     Q.  Very similarly to the circumstances
10 projected in Exhibit 32?
11    A.  That's right.
12    Q.  And then the projected net -- sorry.  The
13 potential net sales proceeds to the fund that is
14 modeled is 267,873, right?
15    A.  Correct.
16    Q.  And that doesn't bring the capital account
17 projected balance to zero, does it?
18    A.  It does not.
19    Q.  It would leave it short by almost $500,000,
20 right?
21    A.  That's right.
22    Q.  That shortage would effectively leave a
23 positive capital account at the fund, correct, for
24 the limited partner in the project partnership, right?

Page 77

1      MS. FRIEDMAN:  Objection.
2      Q.   I'll restate it.  If you apply the 267 to
3  the 747,970, that leaves a positive capital account
4  for the limited partner in the Fern Hall
5  Partnership, correct?
6      A.   Correct.
7      Q.   And then that positive capital account
8  would be written off under these circumstances if
9  they occurred, correct?
10      MS. FRIEDMAN:  Objection.
11      A.   The fund would receive on its K-1 from the
12  Fern Hall partnership a loss on sale, if you will,
13  or a taxable loss of that 500,000.
14      Q.   Which effectively is writing it down to
15  zero, right?
16      MS. FRIEDMAN:  Objection.
17      A.   Correct.
18      Q.   Now, it's true, isn't it, that you could
19  receive $25,777 rather than $267,873, right?
20      MS. FRIEDMAN:  Objection.
21      A.   If that was the terms of the agreement, yes.
22      Q.   And if the terms of the agreement resulted
23  in those circumstances, the projected positive
24  capital account would be roughly $725,000 remaining,

Page 78

1  correct?
2      A.   Correct.
3      Q.   And the Fern Hall Limited Partnership could
4  allocate that $725,000 loss to the limited partner,
5  correct?
6      A.   Correct.
7      Q.   And the fund would then write that down to
8  zero and receive the tax benefit, correct?
9      A.   They would receive a tax benefit from that
10  write-off, that's correct.
11      Q.   Who makes the decision in preparing these
12  reports to assume that the proceeds would be
13  267 rather than 25,000?
14      A.   So in this report dated 2014, so right now
15  it is simply the Prism system, if you will, that is
16  calculating those numbers.  As I mentioned, because
17  of -- there's a rating system, again, if you will.
18  Prism recognizes that there's a positive capital
19  account balance compared to what is available for
20  potential net sales proceeds.  It targets this as
21  potential net sales proceeds as the source, which
22  means that the entire net sales proceeds will come
23  to the limited partner because of that positive
24  capital account.

Page 79

1      Q.   Why, if you know, does Prism assume that
2  the entire net proceeds from sale would go to the
3  limited partner rather than the proceeds via the
4  waterfall?
5      A.   Because, generally speaking, the
6  partnership rules are, specifically under 704B, that
7  the limited partner receives its positive capital
8  account back at the end of the deal, at the end of
9  the -- when the interest is disposed of.
10      Q.   Prism is making that determination?
11      A.   Prism is not making that determination.  We
12  as a company have an understanding of how the
13  partnership rules are applied at the Lower Tier
14  level.  As a result, we have built Prism to model
15  essentially those rules.
16      Q.   Why, then, if there's a positive capital
17  account would you as a company model a distribution
18  of proceeds via the waterfall if there's a positive
19  capital account?
20      A.   So we calculate all of the potential
21  sources, potential net sales proceeds, the tax
22  capital balance, and the waterfall.  There are
23  instances where a property will not have a positive
24  capital account, and so we look to then the

Page 80

1  waterfall to determine what the source is, if any
2  proceeds are coming up to the fund.  So what comes
3  up to the fund could be -- you know, just looking
4  here, it could be one of these three columns.
5      Q.   So essentially Prism is modeling "This is
6  what we think the capital account will look like in
7  the year in which we anticipate a disposition"; is
8  that right?
9      MS. FRIEDMAN:  Objection.
10      A.   Correct.
11      Q.   It's also modeling, "If there happens to be
12  a sale of the apartment complex or the project, this
13  is what we project might come to us via that sale
14  under a dissolution of the partnership and a return
15  of positive capital accounts," correct?
16      MS. FRIEDMAN:  Objection.
17      A.   Under a capital transaction that results in
18  liquidation and dissolution, yes.
19      Q.   So the potential net sales proceeds column
20  is reflecting a capital transaction that results in
21  a dissolution of the partnership and liquidation of
22  its assets, correct?
23      A.   The 267 is simply the calculation of the
24  net sales proceeds of that project.  So in a sale

Page 81

1    environment, yes.  In a sales event.
2        Q.   So in the event of the sale of the
3    apartment complex, right?
4        A.   Correct.
5        Q.   And the proceeds to the fund via the
6    waterfall is also modeling a sale of the apartment
7    complex, correct?
8        A.   Correct.
9        Q.   So the potential net sales proceeds is --
10   strike that.
11           The proceeds to the fund via the waterfall
12   is the -- I already asked that question.  Never mind.
13           Under these circumstances, if they were to
14   occur in 2020, as modeled, neither the distribution
15   of proceeds via the waterfall or potential net sales
16   proceeds brings the capital account to zero, does it?
17       A.   It does not.
18       Q.   And in both instances -- pick one and apply
19   it each time -- the capital account balance will
20   remain positive and be written off, correct?
21           MS. FRIEDMAN:  Objection.
22       A.   The fund will receive a loss in the amount
23   of the difference, which will write the capital
24   account to zero.

Page 82

1        Q.   And if the loss allocation that comes to
2    the fund is $525,000, those losses flow through
3    99.99 percent to the investors in the fund, the
4    limited partners in the fund, right?
5        A.   They do.
6        Q.   And if there is $25,000 of cash that comes
7    into the fund, the general partner will receive some
8    portion of that cash, correct?
9        A.   So that cash will come into the fund, and
10   then the fund manager will determine what happens
11   with that cash.
12       Q.   It will go to pay operating expenses
13   potentially, right?
14       A.   Yes, potentially.
15       Q.   It could potentially be used to pay
16   deferred asset management fees due to BFIM, correct?
17       A.   Could be, yes.
18       Q.   And if the cash coming into the fund is
19   $267,000, there's more money available to pay
20   operating expenses, right?
21       A.   There would be more money coming into the
22   fund, yes.
23       Q.   To pay operating expenses, right?
24       A.   Yes.

Page 83

1        Q.   To pay deferred asset management fees due
2    to BFIM, correct?
3        A.   Correct.
4        Q.   So the more cash that comes in, the more
5    beneficial it is to the general partner of the fund
6    when you compare it to the loss allocations that
7    come to the fund, correct?
8            MS. FRIEDMAN:  Objection.
9        A.   Well, it's more beneficial to the partners
10   of the fund.  I mean, there's nothing that says that
11   that cash is not going to make its way to the
12   investors, depending on the dynamics of the fund.
13       Q.   The fund manager, BFIM, will make those
14   determinations, right?
15       A.   Within the parameters of the fund
16   agreement, correct.
17       Q.   But there really are no determinations to
18   be made when it comes to the allocation of losses
19   because they just flow through automatically to the
20   investor at 99.99 percent, correct?
21           MS. FRIEDMAN:  Objection.
22       A.   That's correct.
23       Q.   So a cash event at the Upper Tier results
24   in a potential greater economic advantage for BFIM

Page 84

1    than the loss allocation, correct?
2        A.   To Boston Financial?
3        Q.   Yes, to the general partner in the fund,
4    the Boston Financial affiliate.
5            MS. FRIEDMAN:  Objection.
6        A.   More cash provides for more sources to pay
7    fund level expenses.
8        Q.   And that includes payments to Boston
9    Financial Investment Management, correct?
10       A.   That may include payments to Boston
11   Financial for deferred asset management fees, correct.
12       Q.   The Potential Net Sales Proceeds column,
13   you would agree with me that that's not identifying
14   any waterfall provision within the Fern Hall
15   Partnership Agreement, right?
16       A.   So are we still referring to Page 8994 to --
17       Q.   Yes, sir.  Well, it's really 8922 with the
18   heading Potential Net Sales Proceeds, do you see
19   that?
20       A.   I do.  Sure.
21       Q.   That's not pulling from some waterfall in a
22   partnership agreement, is it?
23       A.   It is not.
24       Q.   These spreadsheets, they are updated

1    A.  I do.
2    Q.  Why?
3    A.  So Epicor starts with our beginning equity
4  balance of 2,010,000 that we put into the -- that
5  the fund -- excuse me -- put into the project
6  partnership.  That 2,010,000 is being reduced by
7  cash distributions and tax losses.  So the fund
8  stepped into this partnership, stepped into the
9  shoes of an existing -- excuse me -- exiting partner
10  and received a capital account that was less than
11  the full amount of money that the fund put into the
12  project.  So we are recognizing here that there's a
13  difference in those two numbers.
14    Q.  And that distribution is reflected on the
15  last page, 4473, of roughly $430,000?
16    A.  That's correct.
17    Q.  Is there any significance to this
18  discrepancy?  Does it mean anything to this lawsuit?
19        MS. FRIEDMAN:  Objection.
20    A.  No.
21        (Document marked as Rogers
22        Exhibit 36 for identification)
23    Q.  Exhibit 36, the Control number is BFIM9032
24  and ending in 9217.  The date created is 8/31/14.

1  Limitation Screen Status 8/21/14, Excel spreadsheet,
2  do you see that?
3    A.  I do.
4    Q.  What is this document?
5    A.  It has been significantly redacted.
6    Q.  I mean, there's essentially nothing in here
7  other than the headings for something called "Jeff's
8  Fund Plan List."  What is this?
9    A.  Okay.  So this is a screen within Prism
10  titled "Disposition Limitations."  So when a
11  property is assigned to a capital transactions
12  person, it is their responsibility to read through
13  the various documents, understand the provisions
14  specific to the exit from the partnership and
15  identify any limitations to that ability to exit the
16  partnership.  So what this report tells me right now
17  is that in 2014, there were no limitations
18  identified for the Fern Hall project partnership.
19    Q.  Which is why it doesn't appear here because
20  there would only be properties identified that had
21  limitations?
22        MS. FRIEDMAN:  Objection.
23    Q.  Is that right?
24    A.  That either a) they had limitations;

1  b) that -- not necessarily that they had imitations,
2  but that the limitations screen had been populated.
3        MS. FRIEDMAN:  Objection.  Can we go off
4  the record for just a second?
5        MR. DAVENPORT:  Sure.
6        (Discussion off the record)
7        MR. DAVENPORT:  We were just talking about
8  Exhibit 36.  Ms. Friedman is just going to check to
9  see if there was a technical error with the
10  redactions and maybe perhaps Fern Hall might be in
11  this spreadsheet, or not.  She will let us know.
12    Q.  Why is it called "Jeff's Fund Plan List"?
13    A.  So it used to be called Jeff's Fund Plan
14  List, but now in Prism it's just referred to as the
15  CTT Fund Plan.
16    Q.  Oh, is it because he was in charge of the --
17    A.  He was the manager.
18    Q.  Do you know, does he have any ownership
19  interest in any of the interests in this fund?
20    A.  I'm not aware that Jeff -- if Jeff has an
21  ownership percentage in any of the funds.
22    Q.  Do you know if Ken Cutillo does?
23    A.  Ken Cutillo is no longer with Boston
24  Financial.

1    Q.  But does he have any ownership interests in
2  the fund?
3        MS. FRIEDMAN:  Objection.
4    Q.  Any of the funds, if you know.
5    A.  It is doubtful that Ken Cutillo has
6  ownership interests in any of the funds that remain
7  with Boston Financial at this time.
8    Q.  Do you know if when he left Boston
9  Financial, he took any ownership in funds with him?
10        MS. FRIEDMAN:  Objection.
11    A.  When Orix purchased Boston Financial, prior
12  owners took with them funds that Orix did not
13  purchase for various reasons.
14    Q.  Are there any funds that Orix did not
15  purchase that Mr. Rahn has an ownership interest in,
16  if you know?
17        MS. FRIEDMAN:  Objection.  I don't know
18  what the relevance of this is.
19    A.  I do not know.
20    Q.  When Orix acquired Boston Financial, did it
21  acquire this fund?
22    A.  32?
23    Q.  Yes.
24    A.  It did.

## Page 101

1      A.  Within Boston Financial?
2      Q.  Yes, sir.
3      A.  Yes.
4      Q.  Who?
5      A.  So if you are referring to, like, the IT
6   folks that I needed to help me source or search for
7   emails within our system; is that what you are
8   referring to when you say "help"?
9      Q.  Yes.  You had some folks in IT help search
10   for electronic documents like emails and things?
11      A.  Uh-huh.
12      Q.  We have gone through a number of
13   spreadsheets and documents contained in the three
14   different types of databases which you identified,
15   Epicor, and whatnot.  Are there hard copy files that
16   you keep that relate to Fern Hall?
17      A.  Hard copies that I keep?
18      Q.  Yes.
19      A.  There are not.  They are all electronic.
20      Q.  So you have an email account at Boston
21   Financial, right?
22      A.  That's correct.
23      Q.  And if you get an email relating to Fern
24   Hall, do you just drop it into a Fern Hall file

## Page 102

1   folder?
2      A.  Typically, yes.
3      Q.  Did you ever have any email communications
4   with Mr. Queener?
5      A.  I did.
6      Q.  How frequent was that?
7      A.  It would be less than five times.
8      Q.  Total?
9      A.  Total.
10      Q.  Did you ever have any email communications
11   with Mr. Queener relating to the value of the
12   limited partner interests in Fern Hall?
13      A.  Yes.
14      Q.  Do you recall when those communications
15   were?
16      A.  So my first communication with Mr. Queener
17   was verbal, and it was in -- sorry -- it was in
18   September of 2018.
19      Q.  So no emails with him before September of
20   2018?
21      A.  That is correct.
22      Q.  What do you recall about the discussion
23   with Mr. Queener in September of 2018?
24      A.  I recall it was an introductory phone

## Page 103

1   conversation, two partners talking about Year 15 and
2   hoping to reach an amicable negotiated settlement.
3      Q.  Do you recall anything more about the
4   conversation other than that description?
5      A.  I do.
6      Q.  What else do you recall?
7      A.  So we addressed the manner in which Boston
8   Financial values its interest and the expectation
9   that Mr. Queener's buyout price would need to
10   include the capital account.
11      Q.  Did you direct Mr. Queener to any provision
12   within the Fern Hall Partnership Agreement that
13   supported him needing to do that?
14      A.  I don't recall us discussing the
15   partnership agreement.
16      Q.  Do you recall anything else that was
17   discussed during the telephone conversation with
18   Mr. Queener?
19      A.  No.  The discussion points were essentially
20   Mr. Queener hoping for a less formal buyout process
21   in order to save money on appraisers, and whatnot,
22   and negotiating a settlement.  We talked about the
23   capital account, or the fact Boston Financial's
24   value would need to consider the capital account.

## Page 104

1   Mr. Queener voiced his displeasure, and then that
2   was basically the substance of the phone conversation.
3      Q.  When you say he voiced his displeasure, was
4   that directed toward or in response to you letting
5   him know that Boston Financial valued the limited
6   partners' interests based on a return of positive
7   capital account?
8      A.  Yes.
9      Q.  Was he rude?
10      A.  No.
11      Q.  Was it just an amicable disagreement
12   between two people on the phone?
13      A.  Yes.
14      Q.  And was it his position that he didn't
15   think it was proper to include capital accounts when
16   valuing the limited partner interests?
17      A.  Yes.
18      Q.  Who initiated the conversation?
19      A.  As I recall, I reached out to Mr. Queener.
20      Q.  Do you have any recollection as to anything
21   that -- why?  Why did you reach out to him?
22      A.  I received a call from his -- or from an
23   attorney of his, that he's associated with, Carol
24   Scogin.  She had reached out to me and let me know

## Page 109

1  are identified in it is generated for purposes of
2  providing it to CohnReznick so they can do their
3  peer review?
4      A.  If that is what this schedule is for, then
5  yes.
6      Q.  Okay.  Has CohnReznick provided any opinion
7  to Boston Financial relating to the Fern Hall
8  capital account?
9          MS. FRIEDMAN:  Objection.
10     A.  No.
11     Q.  You know who Novogradak is, right?
12     A.  I do.
13     Q.  They are similar to CohnReznick in the
14  sense of the business and services that they provide
15  as you described CohnReznick provides, correct?
16         MS. FRIEDMAN:  Objection.
17     A.  Yes.
18     Q.  Does Boston Financial receive services from
19  Novogradak?
20     A.  We engage Novogradak for services, yes.
21     Q.  When you engage Novogradak, what type of
22  services are they engaged to provide?
23     A.  Fund level audits and fund level tax returns.
24     Q.  Similar in scope to the services that

## Page 110

1  CohnReznick provides, correct?
2      A.  Correct.
3      Q.  And Boston Financial's relationship with
4  Novogradak goes back at least 15 years, right?
5          MS. FRIEDMAN:  Objection.
6      I assume that to be the case.
7          MS. FRIEDMAN:  Doesn't assume.
8          THE WITNESS:  Okay.
9      Q.  You believe that to be the case based on
10  your experience working at Boston Financial, right?
11     A.  That's correct.
12     Q.  Are there any other accounting firms that
13  you are aware of that Boston Financial or its
14  affiliates have a relationship with other than
15  Novogradak and CohnReznick?
16     A.  I am aware that we engage Ernst & Young for
17  the same services.
18     Q.  Any others?
19     A.  There's at least one other.  I do not know
20  the name.
21     Q.  Have you ever heard of the group LIHTC
22  Advisors?
23     A.  I have not.
24     Q.  Has Boston Financial engaged Novogradak to

## Page 111

1  provide any services relating to Fern Hall?
2          MS. FRIEDMAN:  Objection.  That sounds like
3  you are getting into -- what services are you
4  talking about?
5          MR. DAVENPORT:  If they provide accounting
6  services, or any services.
7          MS. FRIEDMAN:  As long as there are no
8  privilege issues.
9      A.  No.
10         (Document marked as Rogers
11          Exhibit 40 for identification.)
12     Q.  Do you recognize Exhibit 40?
13     A.  (Examines document)  I do.
14     Q.  This is coming out of the Prism software
15  that you identified earlier in your testimony; is
16  that right?
17     A.  That is correct.
18     Q.  There's an indication here that this is
19  from the year 2018, do you see that?
20     A.  In the upper left-hand corner?
21     Q.  Yes.
22     A.  Yes, I see 2018.
23     Q.  Then there's a calculation date under that
24  of 5/16/19, do you see that?

## Page 112

1      A.  I do.
2      Q.  Does that mean that the information that is
3  reflected in here was calculated as of 5/16/19?
4      A.  It would include, yes, all information
5  available to us up through May 16, 2019.
6      Q.  What is the purpose of this report?
7      A.  This report is labeled "Residual Details -
8  Fern Hall I."  The purpose is to understand the
9  potential residual proceeds that this property, Fern
10  Hall I, may deliver to the fund, ITC 32.
11     Q.  Now, this indicates as of 5/16/19, based on
12  the information that was available, that the
13  proceeds via waterfall if there was a sale of the
14  Fern Hall Apartment Complex would generate an amount
15  of $83,766 to the limited partner, correct?
16     A.  Calculated through the waterfall, that is
17  the correct number.
18     Q.  And that would be the waterfall for the
19  Fern Hall Limited Partnership Agreement found at
20  Section 10.1B, correct?
21     A.  That is correct.
22     Q.  And Section 10.1B, Waterfall from the Fern
23  Hall Limited Partnership, is the waterfall provision
24  that deals with distributions of capital transaction

1  proceeds, correct?
2      A.  Correct.
3      Q.  There's a potential net sales proceeds, or
4  PNSP, as you identified it earlier, amount of
5  $847,761, right?
6      A.  Yes.
7      Q.  And then there's an indication in the
8  allocation of distributable proceeds section on
9  Page 1 of Exhibit 40 of a discounted amount of
10 $500,000, do you see that?
11     A.  I do.
12     Q.  Why is there a discounted amount?
13     A.  So there's a discounted amount because
14 there has been additional analysis done before this
15 print schedule that determined that the projected
16 tax capital balance shown on this page is too high
17 and that once adjusted the amount of proceeds that
18 the fund would expect to receive would be closer to
19 500,000 as opposed to 847,761.
20     Q.  So the discounted amount assumes that the
21 847,761 was discounted by $347,761?
22     MS. FRIEDMAN:  Objection.
23     A.  Could you repeat the question.
24     Q.  Sure.  The potential net sales proceeds

1  identified has been discounted by $347,761 to get to
2  the $500,000 discounted amount, correct?
3      A.  That's what is shown here, correct.
4      Q.  Is there anything in the exhibit that you
5  are aware of that would show us why or how the
6  $347,000 discount was determined?
7      A.  (Examines document)  There's nothing in
8  this exhibit.
9      Q.  Based on Exhibit 40, the discounted amount
10 of $500,000, is this exhibit suggesting that that is
11 what Boston Financial thought the value of its
12 interests were if applying the potential net sales
13 proceeds analysis to the LP valuation?
14     MS. FRIEDMAN:  Objection.
15     A.  Could you rephrase the question.
16     Q.  Sure.  Does this suggest to you that the
17 potential net sales proceeds would result in a
18 $500,000 purchase price for the LPs' interest?
19     MS. FRIEDMAN:  Objection.
20     A.  This suggests to me that there is a capital
21 account balance of an amount near to or greater than
22 $500,000 that would entitle the fund to $500,000 of
23 the potential net sales proceeds.
24     Q.  Does the spreadsheet identify the capital

1  account anywhere?
2      A.  It does.
3      Q.  Where?
4      A.  Right below the potential net sales
5  proceeds is the projected tax capital balance of
6  1,021,000, 1,021,266.
7      Q.  Okay.  If the potential net sales proceeds
8  of $847,000 are available, that would still produce
9  a shortfall for the positive capital account balance
10 as reflected in this sheet, right?
11     A.  As reflected in this sheet, correct.
12     Q.  The difference between those two numbers
13 doesn't produce the $500,000 discounted amount, does
14 it?
15     A.  The difference between the two numbers?
16     Q.  Yes.
17     A.  No, it does not.
18     Q.  Do you have any idea why the $347,000
19 discount was assumed?
20     A.  I do, yes.
21     Q.  Is that because of the difference in the
22 capital account as reflected in the K-1 in Epicor?
23     A.  Well, that's one of the reasons, is that
24 this Prism has a higher balance than what is

1  reflected on the K-1s that come up from the project
2  partnership.
3      Q.  On the last page of Exhibit 40, it says
4  "06/18/18" under the comment, do you see that?
5      A.  Under the comment?
6      Q.  Yes.  Do you see where it says there,
7  "06/18/18"?
8      A.  No.
9      Q.  It's not the last page.  Sorry.  It's
10 Page 5196.  It says, "Comment:  06/18/18," do you
11 see that?
12     A.  I do.
13     Q.  The comment says, "PRIM."  What is PRIM?
14     A.  PRIM stands for portfolio risk and
15 investment management.
16     Q.  What is that?
17     A.  It's a subcommittee with Boston Financial.
18     Q.  Are you on it?
19     A.  I am not on it.
20     Q.  So that subcommittee, "PRIM residual value
21 analysis highlighted a TCB variance between Epicor
22 and LTK-1," do you see that?
23     A.  I do.
24     Q.  What is TCB?

1      A.  Tax capital balance.

2      Q.  And then it says, "BFIM likely to receive

3  amount reflected on K-1 versus Epicor," do you see

4  that?

5      A.  I do.

6      Q.  Did you make these notations?

7      A.  These are my notations.

8      Q.  Why did you make the notation that you

9  would be likely to receive the amounts reflected on

10  the K-1 versus Epicor?

11      A.  The Epicor balance is too high.  It's our,

12  quote, unquote, outside basis.  It's not reflective

13  of what our K-1 tax capital balance is at the

14  project level, and as a practice we don't typically

15  negotiate based on Epicor.

16      Q.  You negotiate based on the K-1?

17      A.  We do.

18      Q.  Tax capital balance, TCB, that is the same

19  thing as a capital account balance, right?

20      A.  Yes.

21      Q.  And then you go on to make the notation

22  "Adjustment of ($319,180) used to display in Prism

23  the EOC TCB that we expect to negotiate for," do you

24  see that?

1      A.  I do.

2      Q.  And so the EOC is end of compliance, right?

3      A.  That's right.

4      Q.  The notation you made on June 18, 2018 was

5  you were going to make the adjustment necessary

6  between the difference between the capital account

7  as reflected in the K-1 versus Epicor of $319,000,

8  right?

9      A.  That's right.

10      Q.  And then that would produce a positive

11  capital account in what amount?

12      A.  It would be closer to what is reflected

13  here on the K-1 ending capital balance of 646,397.

14  I'm not doing the math, but...

15      Q.  Understood.  So there's the 646,397 K-1

16  ending capital account that you had at that time,

17  correct?

18      A.  That's correct.

19      Q.  And you were going to use that as the

20  number at the end of the compliance period that you

21  would negotiate for, right?  That's what you are

22  referring to when you say, "EOC TCB," correct?

23      MS. FRIEDMAN:  Objection.

24      A.  Correct, but that's not the number.

1      Q.  When you said, "Adjustment of 319,180 used

2  to display in Prism the EOC TCB that we expect to

3  negotiate for," what number were you intending to

4  negotiate for if it's not the 646,397?

5      A.  The 646,397 becomes a starting point for

6  our capital account analysis.  One thing that Prism

7  does not -- or is not able to calculate is the gain

8  or loss on sale.  So if you were to assume a sale

9  and liquidation, there would be a loss or gain event

10  from that sale.  Prism is not equipped to be able to

11  make that calculation, and so we make that

12  calculation offline, if you will.

13      Q.  And that's a calculation that assumes the

14  sale of the project and liquidation of the

15  partnership, correct?

16      A.  Correct.

17      Q.  And the projected disposition year was

18  2020, correct?

19      A.  That's correct.

20      Q.  And the purchase option year was 2019,

21  correct?

22      A.  Correct.

23      Q.  And that's intended to reflect the general

24  partner in Fern Hall's buyout option under 6.13,

1  correct?

2      A.  Correct.

3      Q.  On Page 5193, there's a calculation that

4  provides an assumed sale price at fair market value

5  for the Fern Hall Apartment Complex, correct?

6      A.  Correct.

7      Q.  The value as of the date of this

8  calculation, which was May 16, 2019, the fair market

9  value that you projected was $1,900,066.13, correct?

10      A.  That's correct.

11      MS. FRIEDMAN:  Objection.

12      Q.  And you did that calculation based on a cap

13  rate of 7 1/2 percent, correct?

14      A.  Correct.

15      Q.  You basically did an NOI analysis to come

16  to that fair market value sale price for this

17  calculation, correct?

18      A.  Correct.

19      Q.  And so you calculated the fair market value

20  calculation for the sale price and then ran it

21  through 10.1B to come to some numbers, correct?

22      A.  Ran it through 10.1B...

23      MS. FRIEDMAN:  Objection.

24      Q.  Of the partnership agreement.

Page 149

1    not applicable.
2        Q.   Right.  So to close the loop on that, if
3    the capital accounts are determined to be not
4    applicable, there really is no material error that
5    produces a materially different buyout price, correct?
6        MS. FRIEDMAN:  Objection.
7        A.   Could you rephrase the question.
8        Q.   I don't know if I can.  That was so good.
9        A.   I know, but I...  I still contend that
10   there are other material errors.  So I understand
11   what you are asking me, but I am afraid my answer is
12   going to qualify my objection to the other errors.
13   There are other errors in that appraisal.
14       Q.   I understand that contention.  When we look
15   at your analyses here -- and I understand you
16   contend there are other material errors -- we know
17   the capital account issue.  We talked about that ad
18   nauseam, right?
19       MS. FRIEDMAN:  Objection.
20       A.   We could speak more about the capital
21   account, to be honest.  We've talked about the
22   waterfall.
23       MS. FRIEDMAN:  Ad nauseam.
24       A.   Ad nauseam.

Page 150

1        Q.   So understanding the capital account
2    disagreement -- and I understand that you contend
3    there are other material errors.
4        A.   Okay.
5        Q.   But once the capital account is taken out
6    of the analysis as you prepared this, those other
7    alleged material errors have no material impact on
8    the buyout price, do they?
9        MS. FRIEDMAN:  Objection.
10       A.   Correct.
11       MR. DAVENPORT:  Off the record.
12       (Discussion off the record)
13       (Recess at 3:09 p.m.)
14   BY MR. DAVENPORT:  (3:22 p.m.)
15       Q.   You understand that you are still under oath?
16       A.   I do.
17       Q.   You are familiar as a result of this
18   litigation with certain buyout efforts relating to
19   other project partnerships in the BFIM-related
20   portfolio of properties, correct?
21       A.   Can you be more specific on the properties.
22       Q.   Sure.  You are aware that the general
23   partner in a property called Laurel Oaks in South
24   Carolina sought to purchase the limited partners'

Page 151

1    interest in that project partnership, aren't you?
2        A.   Yes.
3        Q.   And you are aware that similar efforts were
4    sought with respect to a property called Magnolia,
5    correct?
6        A.   Yes.
7        Q.   And that similar efforts were sought with
8    respect to a property called Wellington, correct?
9        A.   Correct.
10       Q.   And you know that the general partner in
11   those three project partnerships sought to acquire
12   the limited partners' interests, correct?
13       A.   Correct.
14       Q.   And you know that the general partner in
15   those three deals proposed to use Phil Jones from
16   Cushman & Wakefield, correct?
17       A.   Correct.
18       Q.   And you are aware that the buyout notices
19   relating to those three deals incorporated
20   Mr. Jones' appraisals of value, correct?
21       A.   Correct.
22       Q.   And are you also aware that Mr. Jones'
23   methodology employed in those appraisals was similar
24   to the methodology he employed here with respect to

Page 152

1    Fern Hall?
2        A.   Correct.
3        (Document marked as Rogers
4        Exhibit 44 for identification)
5        Q.   Exhibit 44 is dated August 25, 2017, correct?
6        A.   Correct.
7        Q.   Do you know who Douglas Company is?
8        A.   Yes.
9        Q.   Who is the Douglas Company?
10       A.   They are a development company, a
11   development company that we have entered into
12   partnerships with.
13       Q.   Is it your understanding that this is the
14   buyout notice that Douglas Company delivered at
15   least to BFIM Special Limited Partner, Inc.?
16       A.   (Examines document)  This looks to be a
17   component.
18       Q.   It just doesn't have the appraisals
19   attached to it; is that right?
20       A.   Correct.
21       Q.   It's addressed to BFIM Special Limited
22   Partner, Inc., which is one of the named Defendants
23   in this lawsuit, correct?
24       A.   That's correct.

Page 153

1    Q.   And it's your that understanding as a
2  result of this buyout notice, there were -- I'll
3  strike that.
4           (Document marked as Rogers
5           Exhibit 45 for identification)
6    Q.   I've placed in front of you another buyout
7  notice from the Douglas Company that was sent to
8  Boston Financial Investment Management, Special
9  Limited Partner, Inc., do you see that?
10   A.   Yes.
11   Q.   This is a buyout notice in connection with
12 the Magnolia Place Apartments LP, correct?
13   A.   Correct.
14   Q.   And BFIM Special Limited Partner, as you
15 understand it, is the special limited partner of
16 Magnolia Place, correct?
17   A.   As I understand it, correct.
18   Q.   You also understand it's the special
19 limited partner in Laurel Oaks, correct?
20   A.   Correct.
21   Q.   Is it your understanding that this is the
22 buyout notice that Douglas sent to the BFIM Special
23 Limited Partner, Inc., in connection with its
24 efforts to acquire the limited partner interests in

Page 154

1  the Laurel Oaks project partnership -- sorry -- the
2  Magnolia project partnership?
3    A.   To the best of my knowledge, and, again,
4  recognizing that it does not have the appraisal
5  component, yes.
6           (Document marked as Rogers
7           Exhibit 46 for identification)
8    Q.   Exhibit 46 is also from the Douglas
9  Company.  It is addressed to at least the BFIM
10 Special Limited Partner, Inc., correct?
11   A.   Yes.
12   Q.   You understand this is a buyout notice that
13 Douglas provided to BFIM Special Limited Partner in
14 connection with its efforts to acquire the limited
15 partner interests in Wellington Senior Apartments?
16   A.   Correct.
17           (Document marked as Rogers
18           Exhibit 47 for identification)
19   Q.   I'm showing you what was marked as
20 Exhibit 47.  Do you recognize this as an email
21 exchange that you had relating to the Oaks of
22 Wellington?
23   A.   Yes.
24   Q.   The Oaks of Wellington is the same

Page 155

1  Wellington Senior Apartments that is identified in
2  the buyout notice in Exhibit 46, correct?
3    A.   Correct.
4    Q.   When you were having these communications
5  with these individuals, you were doing so in your
6  capacity as an employee of Boston Financial
7  Investment Management, correct?
8    A.   Can you be more specific about individuals.
9    Q.   Sure.  There's an email --
10   A.   Just specific to this exhibit?
11   Q.   Yes, in this exhibit.
12   A.   Oh, okay.
13   Q.   You were communicating with these
14 individuals identified in the email thread as a
15 representative of Boston Financial Investment
16 Management, correct?
17   A.   That's correct.
18   Q.   And you were doing this in the ordinary
19 course of your business, correct?
20   A.   Correct.
21   Q.   You were doing it in the ordinary course of
22 your business because, at least in part, the Douglas
23 Company had provided a buyout notice relating to the
24 Oaks of Wellington, correct?

Page 156

1    A.   Correct.
2    Q.   Relative to the Oaks of Wellington project,
3  the Boston Financial Investment Management Special
4  Limited Partner approved Phil Jones at Cushman &
5  Wakefield to provide an appraisal in connection with
6  the buyout efforts of the general partner, Douglas
7  Company, correct?
8    A.   Correct.
9    Q.   And you understand that Boston Financial
10 Investment Management, the Special Limited Partner,
11 also approved Mr. Jones to provide appraisals in
12 connection with buyout notices for Laurel Oaks and
13 Magnolia, correct?
14   A.   Correct.
15   Q.   I am showing you a document really quickly.
16 Let's see if you can recognize the signature on
17 that.
18   A.   (Examines document)  It could be one of two.
19   Q.   Whose signature do you think it is?  Who
20 could it be, of both people.
21   A.   Let's see, so 2017... It's either Mike
22 Gladstone or Ken Cutillo.
23   Q.   Okay.  I am not going to mark that.
24           MR. DAVENPORT:  I don't have any more

Page 1



CONFIDENTIAL

BFIM005192

Page  2

Potential Net Sale Proceeds Detail -- Webpage Dialog

**Potential Net Sale Proceeds Calculation Detail - Fern Hall I - 105966 (0732)**

| | Calculated Value | Adjusted Calculated Value | Derivation |
|---|---|---|---|
| ▶ Sales Price (FMV) | $1,966,013 | $1,966,013 | |
| ▶ Terminal Debt | $1,042,168 | | |
| ▶ Sales Cost | $76,084 | $76,084 | |
| Potential Net Sale Proceeds | $847,761 | $847,761 | |

**Sales Price (FMV)**                                          Underwritten Assumptions Used

Revenue Growth Rates            Current Year: 2.00%            Next Year: 2.00%

| Data Element | Calculated Value | Override Value | Adjusted Calculated Value | Annual Carry Forward | Clear Adjustments |
|---|---|---|---|---|---|
| Projected Disposition Year | 2020 | | | ✓ | |
| Final Compliance Year | 2018 | | | | |
| Stabilized Year (UW only) | | | | | |
| Cap Rate% | 7.50 % | 7.50% | 7.50 % | ✓ | |
| Revenue | $336,973 | | | | |
| Replacement Reserves | $8,000 | | | | |
| Operating Expenses | $182,545 | | | | |
| Recurring Adjustment to NOI | | | | ✓ | |
| Terminal NOI Forecast | $147,451 | | | ✓ | |
| Sales Price (FMV) | $1,966,013 | | $1,966,013 | | |

Display Underwritten Assumptions ☐

**Comment:**

*All comments carry forward year-to-year*

**CONFIDENTIAL**

BFIM005193

Page 3

Potential Net Sale Proceeds Detail -- Webpage Dialog

**Potential Net Sale Proceeds Calculation Detail - Fern Hall I - 105966 (0732)**

| | Calculated Value | Adjusted Calculated Value | | |
|---|---|---|---|---|
| Sales Price (FMV) | $1,966,013 | $1,966,013 | Derivation | |
| Terminal Debt | $1,042,168 | | Amortization Schedule | |
| Sales Cost | $76,084 | $76,084 | | |
| **Potential Net Sale Proceeds** | **$847,761** | **$847,761** | | |

**Projected Terminal Debt Balance**

FDA Status: Complete

Display hidden columns ☐

| Lien Position | Loan Type | Lien Character | Original Principal | Current Principal | Projected Principal | Future Projected Additional Interest | Projected Terminal Debt Balance | Override Terminal Debt Balance |
|---|---|---|---|---|---|---|---|---|
| 1st | Permanent Hard | | $1,040,000 | $836,466 | $784,272 | $0 | $784,272 | |
| Totals | | | $1,040,000 | $836,466 | $784,272 | $0 | $784,272 | $0 |

**Other Long Term Liabilities**

| Type | Current Balance | Override Balance | Year to Include in Terminal Debt Balance | Total Included for Current Year | Annual Carry Forward |
|---|---|---|---|---|---|
| Developer Fee Payable | $217,684 | | 2018 | $217,684 | ✓ |
| Development Advances | $40,212 | | 2018 | $40,212 | ✓ |
| Project Expense Loans | $0 | | 2018 | $0 | ✓ |
| Working Capital Loans | $0 | | 2018 | $0 | ✓ |
| Other Long Term Liabilities | $0 | | 2018 | $0 | ✓ |
| ILP Loans | $0 | | | $0 | ✓ |
| Due to Investor LP | $0 | | | $0 | ✓ |
| Totals | $257,896 | $0 | | $257,896 | |

| Terminal Debt components breakout | |
|---|---|
| Total Terminal Debt Balance before Accrued Soft Debt | $784,272 |
| Total Current Accrued Soft Debt Interest | $0 |
| Total Other LT Liabilities included in current year | $257,896 |
| Total Terminal Debt Balance | $1,042,168 |

Clear Adjustments

Comment:

CONFIDENTIAL

BFIM005194

Potential Net Sale Proceeds Detail -- Webpage Dialog

**Potential Net Sale Proceeds Calculation Detail - Fern Hall I - 105966 (0732)**

| | Calculated Value | Adjusted Calculated Value | | Derivation |
|---|---|---|---|---|
| ▶ Sales Price (FMV) | $1,966,013 | $1,966,013 | | |
| ▶ Terminal Debt | $1,042,168 | | | |
| ▶ Sales Cost | $76,084 | $76,084 | | |
| Potential Net Sale Proceeds | $847,761 | $847,761 | | |

**Sales Cost**

**Revenue Growth Rates**   Current Year: 2.00%   Next Year: 2.00%

| Data Element | Calculated Value | Override Value | Adjusted Calculated Value | Annual Carry Forward | Clear Adjustments |
|---|---|---|---|---|---|
| Pre-Payment Penalties | | | | ✓ | |
| Sales Cost | $68,810 | | $68,810 | | |
| State Transfer Tax | $7,274 | | $7,274 | | |
| Local Transfer Tax | $0 | | $0 | | |
| Property Improvement Deduction | | | | ✓ | |
| Other | | | | ✓ | |
| Sales Cost | $76,084 | | $76,084 | | |

Display Underwritten Assumptions ☐

**Comment:**

*All comments carry forward year-to-year*

CONFIDENTIAL

BFIM005195

Page 5

Projected Tax Capital Balance Detail -- Webpage Dialog

**Projected Tax Capital Balance Detail - Fern Hall 1 - 105966 (0732)**                    Derivation

Display hidden columns ☐

| Use K1 Ending Balance | Fund# | Fund Name | Current Tax Capital Balance per BFIM | Adjustments to Current BFIM Balance | Total Current Tax Capital Balance - BFIM | Projected Future Income (Losses) | Projected Future Distributions | Projected Future Refi Proceeds | Projected Other Changes - BFIM Balance | Projected Tax Capital Balance at Disposition - BFIM |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 0732 | ITC 32 | $1,092,400 |  | $1,092,400 | ($62,319) | ($8,815) |  |  | $1,021,266 |
|  |  |  | $1,092,400 |  | $1,092,400 | ($62,319) | ($8,815) | $0 |  | $1,021,266 |

K1 Type:  [Tax]

Total K1 Ending Capital:   $646,397

Interest Opt Election made?:  No        Election Year:

View Loss Projections

*Note: For split deals, link will bring you to the fund with the largest BFIM ownership %*

**Other Partners**

Save        Recalculate

**Comment:**

061515: BFIM residual value analysis highlighted a TCB variance between Ericor and LT K-1. BFIM likely to receive amounts reflected on K-1 vs Ericor. Adjustment of ($319,180) used to display in PR35M the EOC TCB that we expect to negotiate for.

CONFIDENTIAL                                                                    BFIM005196

Page  6

Waterfall Distributable Proceeds Detail -- Webpage Dialog

**Waterfall Distributable Proceeds Detail - Fern Hall I - 105986 [0732]**

Waterfall Starting Balance = $847,761

| Priority | Priority Type | Explanation | Paid To | % of Item | % of Sales Proceeds | Defined Amount | Calculated Amount | Adjusted Amount | % Paid | Amount Payable | Current Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Debts & Obligations | | Other | 100.000000% | | | | | 100.000000% | | |
| 2 | Reserves & Contingent Liabilities | | Other | 100.000000% | | | | | 100.000000% | | |
| 3 | Developer Fee | | GP | 100.000000% | | | | | 100.000000% | | |
| 4 | Project Expense & Working Capital | Oversizing | GP | 100.0000000% | | | | | 100.000000% | | |
| 5 | GP Capital Contribution | | GP | 100.000000% | | | | $100 | | 100.000000% | $100 | $847,661 |
| 6 | Cumulative PD Incl Cash Flow | | LP | 100.000000% | | | | $0 | | 100.000000% | $0 | $847,661 |
| 7 | Cash Distribution | | LP | | | $10,000 | | $10,000 | | 100.000000% | $10,000 | $837,661 |
| 8 | Final Split | | LP | 100.000000% | | | | $837,661 | | 10.000000% | $83,766 | $0 |
| 9 | Final Split | | GP | 100.000000% | | | | $837,661 | | 90.000000% | $753,895 | $0 |

Add Priority     Remove Priority

**Waterfall Distributable Proceeds**

| Partner | | Proceeds Per Waterfall | Override |
|---|---|---|---|
| GP | | $753,995 | |
| SLP | | $10,000 | |
| Other | | $0 | |
| LP | | $83,766 | |

| Fund Number | BFIM Ownership | Capital Contribution | Property Residual Allocation | HT/ Portfolio Fund # | HT Residual Allocation | Proceeds Per Waterfall | Override |
|---|---|---|---|---|---|---|---|
| 0732 | 100.00 % | $2,010,000 | 100.00 % | | | $83,766 | |

Comment:

CONFIDENTIAL

BFIM005197

Exhibit F

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

COMPLEX BUSINESS LITIGATION DIV.

CASE NO.:  2019-16913-CA-01 (44)

OPA-LOCKA COMMUNITY
DEVELOPMENT CORPORATION, INC.,
a Florida non-profit corporation,

        Plaintiff,

v.

HK ASWAN, LLC, a Massachusetts
limited liability company, HALLKEEN
MANAGEMENT, INC., a Massachusetts
corporation, and ASWAN VILLAGE
ASSOCIATES, LLC, a Florida limited
liability company,

        Defendants.

_____/

**OMNIBUS ORDER ON (i) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
(ii) PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT,
(iii) PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND (iv) DEFENDANT HALLKEEN
MANAGEMENT, INC.'S MOTION FOR SUMMARY JUDGMENT ON COUNT I**

**THIS MATTER** came before the Court on (i) Defendants HK Aswan, LLC

("HK Aswan"), HallKeen Management, Inc. ("HallKeen Management"), and Aswan Village

Associates, LLC's ("Owner" or "AVA") (collectively, "Defendants") Motion for Summary

Judgment ("Defs. Mot.") against Plaintiff Opa-Locka Community Development Corporation

("OLCDC" or "Plaintiff"); (ii) OLCDC's Renewed Motion for Partial Summary Judgment

("OLCDC Renewed Mot."); (iii) OLCDC's Motion for Judgment on the Pleadings or, in the

Alternative, Partial Summary Judgment ("OLCDC MJP"), and (iv) Defendant HallKeen

Management's Motion for Summary Judgment on Count I ("HKM Mot.") against OLCDC.

Based upon the Court's review of the motions, the supporting exhibits, deposition and other

transcripts, the applicable portions of the record, argument of counsel, and being otherwise duly advised in the premises, the Court makes the following findings:

**Findings of fact**

This matter concerns an affordable housing apartment complex located in Opa-locka, Florida, which is known as Aswan Village Apartments ("**Aswan Village**"), and a right of first refusal granted thereon to OLCDC.  OLCDC is a South Florida-based 501(c)(3) nonprofit corporation whose mission is to transform under-resourced Florida communities into desirable, engaged neighborhoods by improving access to, among other things, affordable housing. In 2000, OLCDC joined Banc of America Community Development Corporation ("**BACDC**") in forming the Company for the purpose of acquiring, developing, and operating Aswan Village as affordable housing, and to finance those activities through participation in the Low Income Housing Tax Credit ("**LIHTC**") program, 26 U.S.C. § 42 *et seq.* ("**Section 42**").

In 2003, after Aswan Village qualified for the allocation of tax credits, OLCDC and BACDC restructured the Company to admit Banc of America Housing Fund ("**BOA**"), as tax credit investor, and Aswan Development Associates, LLC ("**ADA**"), as the Class A Member. Contemporaneously, OLCDC and BACDC withdrew from the Company and were admitted to ADA, leaving BOA and ADA as the only members of the Company.  The Company also entered into a First Amended and Restated Operating Agreement, which includes several amendments (the "**Amended Operating Agreement**").  In accordance with OLCDC's mission and Section 42's aims, BOA and ADA expressly agreed in the Amended Operating Agreement that the Company and Aswan Village would be operated in compliance with Section 42 to "[p]rovide quality affordable housing and combat further community deterioration."

Consistent with that mission, in connection with this Amended Operating Agreement, OLCDC bargained for, and the Company agreed to, a Right of First Refusal Agreement under Section 42 (the "**ROFR**").  It provides, in relevant part:

> Right of First Refusal. After the end of the Compliance Period, the Company will not sell the Project or any portion thereof to any Person without first offering the Project for a period of forty-five (45) days to Purchaser (if it then qualifies as an organization described in Section 42(h)(5)(c) of the Code) (the "Buyout"), at a price (the "Buyout Price") [set forth in Section 42(i)(7) of the Code]; provided, however, that such right of first refusal shall be conditioned upon an agreement by Purchaser to maintain the Project for low-income use for at least fifteen (15) years after the later of the end of the Compliance Period (but in no event can such low-income use terminate before the end of the Extended Use Period) under Section 42 of the Code  . . . . In the event that Purchaser does not purchase the Company Property on the terms set forth above, then the right of first refusal granted herein shall lapse. ***

HKM is a Massachusetts-based, for-profit corporation that operates collectively as an owner and investor and manager of affordable housing.  In 2014, after the Credit Period was over and BOA had received all of its bargained-for tax credits, BOA sold its tax credit investor position.  Specifically, HKM, through its specially created affiliate, HKA, acquired all of BACDC's ownership interests in ADA for between $250,000 - $400,000.  As a result, HKA became ADA's 51% owner and the Company's Manager.  HKA then caused ADA to redeem all of BOA's interests in the Company, leaving ADA as the sole member of the Company and HKA as the controlling member of ADA and the Company.  OLCDC retained its 49% position in ADA.

HKM then caused HKA to engage HKM to act as the Company's Management Agent. As such, HKM manages Aswan Village's day-to-day operations and is compensated for those services accordingly.  As the Company's Management Agent, HKM is empowered with the managerial powers delegated to it by HKA. When HKM caused HKA to purchase BACDC's interests in 2014, it sought to eliminate the ROFR, but OLCDC refused.  Thus, when ADA's

operating agreement was amended (the "**ADA Agreement**") to allow HKA's admission into ADA, the parties expressly maintained OLCDC's ROFR as a "distinct right" in their agreements. As a compromise, the parties agreed to add Section 10 to the ADA Agreement, which the parties refer to as the "forced sale provision."  It provides, in relevant part:

> From and after the end of the Compliance Period . . . , OLCDC shall have the right to direct [HKA] to cause [the Company] to put [Aswan Village] on the market for sale . . . .  [The Company] will, in accordance with Section 14.02 (Right of First Refusal) of the [Amended] Operating Agreement first offer the Project for sale to OLCDC.  If, after having directed [HKA] to cause [the Company] to put the Project on the market for sale, OLCDC elects to exercise its right of first refusal, then OLCDC agrees that . . . OLCDC shall purchase all of the Interests owned by HKA in ADA . . . .

Absent the invocation of this Section 10 right under the contractually agreed-upon circumstances, Defendants recognize that, because of the ROFR, they have "no real equity" in the Company and Aswan Village and have "no value except through operating cash flow." Accordingly, when Defendants consummated the aforementioned transaction to acquire BOA's position in the Company, they paid no more than $400,000 because OLCDC's ROFR preserved all of Aswan Village's equity for OLCDC, which is precisely its intent of the ROFR and consistent with the policy goals and objectives of Section 42 and LIHTC program in general. It is undisputed true that Owner has not entered into a purchase and sale agreement for the sale of the Property at any time, nor scheduled a closing to consummate a sale of the Property.

It is important for this Court to detail how the Low Income Housing Tax Credit ("LIHTC") Program works.  As set forth in Section 42, the LIHTC program is a federal subsidy program specifically designed to promote the nationwide development and preservation of rental housing that is affordable to low and moderate income households.  The LIHTC program subsidizes low-income housing by: (1) making available to a "qualified low-income housing project" tax credits, which provide a dollar-for-dollar income tax reduction; and (2) permitting

institutional investors with large, annual, and predicable income tax obligations (known as "tax credit investors"), such as banks, to acquire these tax credits in exchange for providing capital necessary to develop the project.  *Low Income Housing Tax Credit: The Role of Syndicators*, U.S. Government Accountability Office, GAO 17 285R, at 1, 4 (February 16, 2017), https://www.gao.gov/assets/690/ 682890.pdf  (hereinafter, "***The Role of Syndicators***").  In the typical case, this is accomplished by the tax credit investor's equity investment into a partnership or similar "pass-through" tax entity—in this case, a limited liability company—created for the purpose of developing the apartment complex.  *The Role of Syndicators*, at 1; *The Low-Income Housing Tax Credit Program at Year 25: An Expanded Look at Its Performance*, Cohn Reznick LLP at 67 (December 2012), *available at* https://www. cohnreznick.com/insights/lihtc-program-year-25-expanded-look-at-performance.  In return for the infusion of capital—which is combined with debt necessary to finance the development—the tax credit investor, which consequently holds almost all of the equity in the entity (usually 99 percent or more), is allocated a commensurate amount of the tax benefits flowing from operations of the apartment complex, including the LIHTC tax credits and other tax losses and deductions.  Through this framework, Section 42 advances the deliberate policy choice to *replace* a typical equity investor's expectations of "economic cash flow or appreciation" from the apartment complex *with* a comparable or better return on investment "almost solely derived from tax benefits."

To ensure low-income housing is not immediately converted to market-rate housing, the LIHTC program staggers the allocation of the tax credits over a period of ten years, known as the Credit Period.  Further, to avoid recapture of the tax credits after they have been allocated, the owner of an affordable housing must continue to comply with rent affordability restrictions for a contemporaneously running period of fifteen years, known as the Compliance Period.  Moreover,

for any LIHTC project allocated tax credits after 1989—as is the case here—the owner of the project must also agree to comply with the affordability restrictions for an additional fifteen years after the Compliance Period, known as the Extended Use Period, meaning affordability restrictions remain in place for a total of thirty years following the apartment complex being placed into service.

But the LIHTC program's aim of creating and preserving low-income housing does not end at thirty years.  Rather, the LIHTC program seeks to preserve low-income housing in perpetuity by creating a special role for nonprofits, like OLCDC, whose missions are not to profit from a sale of the low-income housing project, but to continue to develop and preserve the low-income housing in perpetuity for the betterment of the public and the community in which project is located.  Specifically, the LIHTC program, which is administered locally by the Florida Housing Finance Corporation, requires each State to set aside at least ten percent of its allocable tax credits—the obtainment of which is highly competitive—for projects developed and operated in conjunction with a qualified nonprofit organization, such as OLCDC.

In addition, and as particularly relevant here, Section 42 expressly authorizes the owners of the apartment complex to grant a "qualifying nonprofit organization" a "right of first refusal" to facilitate the inexpensive transfer of the project "after the close of the compliance period" for a statutorily-defined, below-market "minimum purchase price."  26 U.S.C. § 42(i)(7)(A).  In doing so, Section 42(i)(7) creates "a safe harbor for property owners," without which longstanding tax law would operate to "disqualify[] them from the tax credits that are the key economic incentive for their investment in affordable housing." The expectation is for the properties to remain with the nonprofit owners in perpetuity and to continue to be operated as affordable housing.

In October 2018, in response to an article regarding Miami's drinking water, HKM and HKA unilaterally commenced discussions regarding the sale of Aswan Village, engaged brokers to obtain broker opinions of value for Aswan Village, concluded that Aswan Village had substantial equity, and conducted potential disposition analyses regarding Aswan Village. (Documenting Defendants' impression that they should "sell [their] Miami area properties ASAP" and that, accordingly, they "should find out quickly" what they "could sell them for"). There is no dispute that Defendants were aware of the existence of OLCDC's "distinct" ROFR at all relevant times. There is also no dispute that Defendants engaged in a sequence of events to execute their "Florida recapitalization plan." This "recapitalization plan" included the ultimate fee simple sale of, or transfer of ownership interests in, Aswan Village and two other Florida LIHTC properties—Park City Apartments ("**Park City**") and Palmetto Park Apartments ("**Palmetto**")—to a new ownership entity.

Before Defendants approached OLCDC regarding the possible sale of Aswan Village, Park City and Palmetto, and before they informed OLCDC of their unilateral intentions and actions, Defendants had already begun soliciting proposals from third parties to acquire the three properties, including a third party known as Lincoln Avenue Capital ("**LAC**" or "Lincoln"). In fact, on April 15, 2019, LAC, a trade name for an affordable housing developer that conducts business through various entities, presented a letter of intent proposing two joint venture transactions regarding the "Aswan Village Apartments" to Mark Hess, Vice President of Acquisition and Development of HallKeen Management. ("LOI"). Mr. Hess had been communicating with Lincoln's representatives regarding Lincoln's interest in the Property for the purpose of presenting Lincoln's proposal to HK Aswan and OLCDC so they, as members of

ADA, could consider the joint venture transactions proposed. The LOI expressly acknowledges its preliminary, nonbinding nature. In material part, the LOI states on the first page:

> [T]his Letter of Intent, outlining certain terms under which Lincoln Avenue Capital (the 'Buyer') intends to negotiate a mutually acceptable Purchase and Sale Agreement ('PSA') for the purchase of the above captioned real estate . . . . This letter shall not create any binding obligations on any party hereto, and completion of the transaction remains subject to the successful negotiation and execution of a PSA between the parties.

*Id.*

The LOI proposed two alternative joint venture structures. The first structure, which contemplated "closing directly into the tax credit partnership," listed a sales price of $21,000,000. *Id.* The second structure, which contemplated "closing into bridge partnership prior to tax credit partnership," listed a price of $20,370,000. *Id.*

On March 6, 2019, Mark Hess updated the HKM "Investment Committee" regarding the "proposals" "we recently solicited . . . to dilute our equity interests in the 3 Florida deals." In providing this update, Mr. Hess remarked: "Please see the DRAFT Roseview outline pitched below. One nice thing about this structure is that it may appear relatively innocuous to OLCDC . . .." (*Id.*) Additionally, as reflected in a March 13, 2019 e-mail, LAC wrote to Defendants: "Per our conversation yesterday, enclosed in this email is a LOI from Lincoln Avenue Capital for the "HallKeen Florida assets (Park City Apartments, Aswan Village Apartments, and Palmetto Park Apartments)."

At this time, Defendants did <u>not</u> understand OLCDC to have decided to buyout HKA's interests under Section 10 of the ADA Operating Agreement commenting internally on March 14, 2019: "If we pick our timing and go to OLCDC with 10/10 on with 20% we may be able to sell this [LAC] Aswan deal to Willie." This reflected Defendants' understanding on March 4, 2019 that "[Aswan Village] is still the trickiest because we need to meet OLCDC objectives and

they, so far, are resisting a sale or fixing up any portion of their interest."  The undisputed evidence of record establishes that, on March 18, 2019, OLCDC did not request or otherwise cause Defendants to solicit any proposals.  Indeed, the undisputed evidence of record is that Defendants had been working to not only solicit proposals to sell Aswan Village prior to this time, but they were concurrently soliciting proposals to sell Park City and Palmetto as well.  There is no dispute that Defendants "disclose[d] having 5 proposals" to sell all three LIHTC properties, which included Aswan Village, and declared that they would "make a final decision on April 3 and then inform [OLCDC] of what the deal is."

It is undisputed that, on April 4, 2019, Defendants requested that the combined LOI for all three properties—that Defendants had solicited on March 12 and received on March 13—"be structured as 3 standalone offers," acknowledging that there were "different parties with different interests invested in each deal."  Defendants further requested that LAC confirm that it did "not need the offers to be interdependent."  On April 8, 2019, after a self-described "productive call" with LAC, Mark Hess informed the "Investment Committee" that it could "Expect 3 standalone LOIs this week" and also noted that LAC had "increased" the "Park City offer by $850k to $14.35 million."

On April 9, 2019, before Defendants had received the updated LOIs from LAC, Mr. Hess instructed another individual to begin assembling various environmental due diligence documents "[i]n preparation for accepting LOI's on the Florida portfolio."  On April 16, 2019, Defendants sent to OLCDC for "partner approval" an LOI from LAC that Defendants had executed, "acknowledged and accepted" on behalf of the Company, as the proclaimed "SELLER" of Aswan Village.  In the e-mail forwarding the LOI, Defendants declared: "As you can see from the attached LOI, we have decided to go forward with Lincoln Avenue Capital . . .

the pricing came in a bit better than we expected with . . . $21,000,000 for Aswan."  (*Id.*)

Defendants then described what "will" happen as a result of the sale to LAC.

More specifically, Defendant "outlined the general structure of the transaction should

[OLCDC] desire to proceed . . . as stated in the LOI."   Defendant also informed Logan that any

further discussions with Lincoln were conditioned upon OLCDC agreeing to terminate, or waive,

its right of first refusal.  Defendants also stated it was "anxious to keep the process moving with

LAC," and consequently wanted OLCDC's own "decision" as to whether it would consent to the

sale or buyout HKA.  There is no dispute that, before sending the LOI to OLCDC on April 16,

2019, Defendants first returned an executed, "acknowledged and accepted" copy of the LOI to

LAC.

Additionally, on April 16, 2019, Defendants updated one of the brokers, informing him

that Defendants "are looking for partner consent right now to move forward with a J/V

ownership/syndication on all 3 deals . . .."  On April 22, 2019, Defendants contacted one of the

unsuccessful prospective purchasers from whom Defendants had solicited a proposal.  Defendant

stated Defendants "executed an LOI with a J/V partner on the 3 properties last week" and

"hope[d] to get to a [purchase and sale agreement] over the coming weeks."  (Exhibit B to

Renewed Motion) Defendants then thanked the prospective purchaser for its interest in the deals

and indicated Defendants' "interest[] in finding a way to work with" the prospective purchaser

"in the future."  (*Id.*)  That same day, Defendants informed LAC that due diligence documents

would be "posted tomorrow."

On April 29, 2019, Defendants provided LAC with a draft purchase and sale agreement

("**PSA**") for Palmetto.  Defendants then stated: "Once we have a sense of your comments on the

Palmetto PSA, we can use this as a base form to quickly finalize [the Project] and Park.  In the

meanwhile, we will start on the PSA exhibits."  That same day, Defendants executed and returned engagement letters to Novogradac & Company LLP ("**Novogradac**") for the preparation of "sales projections" analyses "for Park and [Aswan Village]," which Defendants requested Novogradac "then forward . . . to our team so that we can help prepare the waterfall for the tiers."

On May 5, 2019, in response to a request for an update regarding apartment staff messaging, Defendants expressed: "Hopefully we will have Palmetto's signed PSA by Friday and the balance over the following week or two."  The next day, May 6, 2019, OLCDC conveyed to Defendants the requisite "partner approval" to the LOI, subject to the exercise of OLCDC's ROFR, thus providing full ADA member approval to the sale.  OLCDC made it clear that it did not intend to terminate or waive its right of first refusal. On May 7, 2019, after OLCDC provided the requested "partner approval" to the LOI, Defendants told LAC that they "were unable to secure our partner approvals" and "had to let the LOI lapse."  Defendants argue that because OLCDC did not agree to terminate its preemptive right, Defendants informed Lincoln that "partner approval" had not been obtained to proceed with the LOI.  Defendants take the position that HK Aswan and OLCDC, as the two members of ADA, failed to reach an agreement on how to proceed regarding the joint venture transactions proposed in the LOI.

Defendants refused to permit OLCDC to exercise its ROFR and/or close on the sale of Aswan Village pursuant to resulting option contract that arose when OLCDC exercised its ROFR.  On June 5, 2019, OLCDC filed this Complaint.  OLCDC alleges the Defendant's actions triggered its right to exercise its ROFR.  OLCDC asks this Court to compel Owner to transfer title to the Property pursuant to and in accordance with the Agreement.  Defendants argue that because no sale was ever scheduled to occur (nor did a sale in fact occur), Defendant was not

obligated to offer the Property to OLCDC for purchase because the ROFR was not triggered and remains unripe.

**Legal Standard in Addressing a Motion for Summary Judgment**

In accordance with Rule 1.510(c), Florida Rules of Civil Procedure, summary judgment will be ordered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions filed together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fla. R. Civ. P. 1.510(c). *Volusia County v. Aberdeen at Ormond Beach*, 760 So. 2d 126, 130 (Fla. 2000). In simple terms, summary judgment is granted when there remains no issue of material fact to litigate. *ARC Foods, Inc. v. NGI Props.*, 724 So. 2d 663 (Fla. 2d DCA 1999). While the moving party has the initial burden of demonstrating the nonexistence of any genuine issue of material fact, the non-moving party must then counter with evidence sufficient to reveal a genuine issue. *Publix Supermarkets, Inc. v. Austin, et al.*, 658 So. 2d 1064, 1068 (Fla. 5th DCA 1995); *Golden Hills Golf & Turf Club, Inc. v. Spitzer, et al*., 475 So. 2d 254 (Fla. 5th DCA 1985).

**Conclusions of law**

Defendants contend that under Florida law there are two threshold conditions that must be met to trigger a right of first refusal: (i) the existence of a third-party offer to purchase the property at issue, and (ii) an owner's expressed willingness to accept such offer. Because the LOI is nonbinding by its own language, Defendants assert it cannot constitute an "offer" capable of "acceptance" and, therefore, cannot trigger OLCDC's right of first refusal. OLCDC, conversely, argues there is no requirement under Florida law of the existence of a third-party offer and that OLCDC's right is triggered at the moment Defendants manifested an intention to sell Aswan Village.

#8345731

12

The parties do not dispute that the language of the Agreement is plain and unambiguous. The interpretation of an unambiguous contract involves a pure question of law. *Press v. Jordan*, 670 So. 2d 1016, 1017 (Fla. 3d DCA 1996); *Jaar v. Univ. of Miami*, 474 So. 2d 239, 242 (Fla. 3d CA 1985).  Florida law clearly recognizes that "[a] right of first refusal is a contractual right."  *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, 986 So. 2d 1279, 1287 (Fla. 2008) ("*Old Port Cove*").  Therefore, like any contractual right, a court determines whether a right of first refusal was triggered by interpreting and enforcing the specific language of the parties' agreement creating the right.  *See Robbinson v. Cent. Props., Inc.*, 468 So. 2d 986, 988 (Fla. 1985) (recognizing that, in interpreting a right of first refusal agreement, "the intention of the parties governs, and such intention will be determined from the language used when it is unambiguous").

The ROFR, at issue in this case, in relevant part, states:

> **Right of First Refusal.**  After the end of the Compliance Period, the Company [Owner] will not sell the Project or any portion thereof to any Person without first offering the Project for a period of forty-five (45) days to Purchaser . . . at a price (the "Buyout Price") . . . .

OLCDC's interpretation of this language is that, in accordance with Section 42, its right to receive the "first offer[]" to purchase Aswan Village is triggered at the moment Defendants manifested an intention to sell Aswan Village.  Defendant's interpretation of the ROFR is that it is triggered only after Defendant has entered into a binding contract with a third-party for the sale of Aswan Village "without first offering" it to OLCDC for purchase, at least, 45 days before any sale is to occur.  Defendants argue because no sale was ever scheduled to occur (nor did a sale in fact occur), Owner was not obligated to offer the Property to OLCDC for purchase because the ROFR was not triggered.

CASE NO.: 2019-16913-CA-01 (44)

Defendants contend that the ROFR must be interpreted strictly under Florida common law.  Under Florida common law, Defendants argue, OLCDC's ROFR is only triggered if the Company had entered into a binding contract for sale and then failed to comply with the ROFR's 45-day notice provision.  At minimum, Defendants further argue, Florida common law requires the receipt of an "enforceable offer" in order to trigger OLCDC's ROFR.  Contrary to the position advanced by Defendants, it is the finding of the Court that under Florida law, "all the laws which subsist, at the time and place of the making of a contract . . . enter into and become a part of the contract made, as if they were expressly referred to and incorporated in its terms . . . ." *Humphreys v. State*, 145 So. 858, 861 (Fla. 1933).  Florida courts accordingly hold that the meaning of contractual terms and attendant rights are animated and defined by applicable law integrated into the contract.  *See, e.g.*, *Gen. Dev. Corp. v. Catlin*, 139 So. 2d 901, 904 (Fla. 3d DCA 1962); *see also Coast Cities Coaches, Inc. v. Whyte*, 102 So. 2d 848, 852 (Fla. 3d DCA 1958) (stating that courts interpret contracts in accordance with the parties' intentions, considering "not only the words used in the contract but the obvious purpose intended to be accomplished by it").

Given the explicit references to Section 42 throughout the ROFR and the Amended Operating Agreement, there can be no dispute that Section 42 is directly incorporated into and is just as much a part of the plain language of those contracts as the other express words appearing therein.  In addition to the text of the ROFR explicitly referencing Section 42, the ripening of OLCDC's "right of first refusal" is tied to the end of the Section 42 "Compliance Period"; the contractual "Buyout Price" is defined, not in accordance with price first offered by a third party, but in accordance with 26 U.S.C. § 42(i)(7); and the exercise of "such right of first refusal" is conditioned only upon OLCDC's agreement to continue to use the Project as affordable housing

for no less than the Extended Use Period as defined by Section 42.  (Compl. ¶ 31-35 & Ex. A § 14.02, Ex. E § 1)   Because the ROFR and the Agreement expressly refer to and incorporate Section 42, they must be interpreted accordingly.  *See, e.g.*, *Humphreys*, 145 So. at 861; *Catlin*, 139 So. 2d at 904.

Defendants would have this Court not only read the ROFR isolated from the remainder of the parties' Amended Operating Agreement, which Defendants do not dispute is fashioned entirely around Section 42, but would have this Court ignore the replete references to Section 42 weaved into the ROFR itself.   This Court finds this position unpersuasive.

The Court does not ignore and fully understands the common everyday definition of the word "sell" which means to "give or hand over (something) in exchange for money," *Sell*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010), or "to transfer (property) by sale," *Sell*, BLACK'S LAW DICTIONARY (11th ed. 2019). The Defendant argues that the Court is not at liberty to rewrite the Parties' Agreement. *E.g.*, *19650 NE 18th Ave. LLC v. Presidential Estates Homeowners Ass'n, Inc.*, 103 So. 3d 191, 194 (Fla. 3d DCA 2012) (the court cannot rewrite a contract "to add language the parties did not contemplate at the time of execution."); *Fernandez v. Homestar at Miller Cove, Inc.*, 935 So. 2d 547, 551 (Fla. 3d DCA 2006) ("[A] court is powerless to rewrite [a] contract to make it more reasonable or advantageous to one of the parties.").  This Court accepts that it is unable to rewrite a contract to add language the parties did not contemplate at the time of execution.  However, that is not what is occurring in this case.

The explicit references to Section 42 throughout the ROFR and the Amended Operating Agreement, commands that Section 42 is directly incorporated into and is just as much a part of the plain language of those contracts as the other express words appearing therein.  In addition to the text of the ROFR explicitly referencing Section 42, the ripening of OLCDC's "right of first

refusal" is tied to the end of the Section 42 "Compliance Period"; the contractual "Buyout Price" is defined, not in accordance with price first offered by a third party, but in accordance with 26 U.S.C. § 42(i)(7); and the exercise of "such right of first refusal" is conditioned only upon OLCDC's agreement to continue to use the Project as affordable housing for no less than the Extended Use Period as defined by Section 42.  (Compl. ¶ 31-35 & Ex. A § 14.02, Ex. E § 1).  Therefore, it is the finding of this Court that the proper "context" in which to interpret a right of first refusal granted in accordance with Section 42 is, "as reflected in the language of the agreements," Section 42.  *See Homeowner's Rehab*, 99 N.E.3d at 753, 755.

There is no genuine issue of fact regarding Defendants' intent to sell.  First and foremost, Defendants executed the LOI—a document the chief purpose of which is to manifest the signatory's intent.  *Midtown Realty, Inc. v. Hussain*, 712 So. 2d 1249, 1252 (Fla. 3d DCA 1998) (stating that a letter of intent memorializes the "preliminary understanding of the parties who intend to enter into contract").  Moreover, no other logical conclusion can be reached from Defendants' undisputed actions, such as, *inter alia*: following the execution of the LOI, which Defendants furnished to LAC before seeking partner approval from OLCDC, declaring to OLCDC that they had "decided to go forward" with the sale to LAC on those terms; thereafter requesting "partner approval," believing that such approval was all that was required "to move forward" with the sale and get to an executed PSA with LAC in mere "weeks"; before hearing from OLCDC, spending significant time and money proceeding with due diligence and the preparation of a PSA and sales disposition analysis in order to "quickly finalize" the sale of the Project for "a $21 million sale price"; and, after OLCDC exercised its ROFR, telling LAC they hoped to "reconstitut[e] the agreement."  Defendants' manifest intent, willingness, and decision

to sell Aswan Village, as a matter of law, triggered OLCDC's right of first refusal to purchase at the Section 42 price.

Defendants' argument is that Andy Burnes—the manager of every asset HKM owns, including HKA, —expressly conditioned Defendants' decision to sell on OLCDC waiving its ROFR rights, and "[a]bsent OLCDC's consent to waiving its ROFR, no desire to sell existed" is unpersuasive and contradicted by the undisputed material facts.  Specifically, consistent with Defendants' pleadings, both Defendants' and OLCDC's understanding is that it was the future closing of the contemplated transaction with LAC that "will" cause the ROFR to "go away." (Dep. Ex. 123; Burnes Dep. at 184:17-185:10; 186:3-8); Doc. No. 159 at pp. 10-11 n.12). And, decisively, rather than send an unexecuted LOI to OLCDC and expressly state that its decision to move forward was "conditioned upon" or "subject to" OLCDC's waiver of its ROFR rights, Defendants executed the LOI before they sent it to OLCDC for approval, and also sent an executed copy to LAC.  Defendants undisputedly did not add a condition upon the decision they had already made.  Therefore, Defendants' arguments fail, and this Court finds that OLCDC's consent provided full authto the LOI sufficient to trigger its ROFR.

Additionally, there is no genuine issue of fact regarding OLCDC's exercise of its ROFR."[O]nce [the Company] manifest[ed] a willingness to [sell]," OLCDC's right of first refusal was triggered, which, once exercised, created an option contract.  *McDonald's Corp. v. Roga Enterprises*, Inc., No. 10-21706-CIV, 2010 WL 4384214, at *2 (S.D. Fla. Oct. 28, 2010) (quoting *Old Port Cove*, 986 So. 2d at 1285).  "When there is an exercise of the option, a mutually binding and enforceable contract to purchase is created."  *Id.* (quoting *Power v. Power*, 864 So. 2d 523, 524-25 (Fla. 5th DCA 2004).  It is undisputed that OLCDC exercised its right of first refusal under the ROFR, thus creating an option contract that the OLCDC is entitled to

specifically enforce.   Further, it is undisputed that, after OLCDC exercised the ROFR, Defendants have since refused to permit OLCDC to close on the sale of Aswan Village.  Thus, the undisputed facts establish that OLCDC's right of first refusal ripened into an option contract, which OLCDC exercised, and which Defendants have consequently breached by refusing to perform thereunder.  OLCDC is thus entitled to a summary judgment of specific performance.

Defendants argue that, even if this Court interprets the ROFR in light of Section 42, Section 42 does not support the manifest-intent-to-sell trigger for which OLCDC advocates. This Court disagrees.   Section 42 does not merely acknowledge that rights of first refusal can be agreed to by parties in connection with the development of a LIHTC developments, as Defendants suggest.  Rather, Section 42 alone makes possible these below-market, "minimum purchase price" rights of first refusal (Section 42 ROFRs) because, in the absence of Section 42's "safe harbor," such below-market rights of first refusal would place the tax credit investors tax credits at risk of recapture.  *Homeowner's Rehab*, 99 N.E.3d at 755-56; *Riseboro Cmty. P'ship Inc. v. SunAmerica Hous. Fund No. 682*, 401 F. Supp. 3d 367, 375 (E.D.N.Y. 2019) (noting that Section 42(i)(7) expressly allow[s] [qualified nonprofit] organizations to have a ROFR to purchase projects at below market prices").   Put simply, these below-market, "minimum purchase price" rights of first refusal only exists because Section 42(i)(7) exists.  Accordingly, as the *Homeowner's Rehab* court recognized, and this Court agrees, Defendants' argument "fails to acknowledge" that a Section 42 ROFR, such as the ROFR here, "is not purely a creation of the common law" but is granted pursuant to Section 42 and must therefore be interpreted in light of Section 42.  Therefore, this Court concludes that, absent language expressly agreed to by the parties to the contrary, all that Section 42 requires as a trigger is a manifest decision to sell by the owner.

Turning to the ROFR here, like Section 42, there is no "binding contract," "enforceable offer" or other express triggering requirements found anywhere upon the face of the document. Rather, the ROFR simply affords OLCDC a "right of first refusal," prohibiting the Company from selling Aswan Village "without first offering" it to OLCDC for a period of 45 days at the Section 42 minimum purchase price.  Therefore, interpreting the ROFR here in light of Section 42, as the plain language of the ROFR demands, and in the absence of any express, contractually agreed-to triggering requirements, this Court concludes that the ROFR is triggered, in accordance with Section 42, upon a manifestation of the Company's decision to sell.

Defendants, however, point to the *Homeowner's Rehab* court's affirmance of an "enforceable offer" requirement under the Section 42 ROFR there to argue that an "enforceable offer" requirement should be imposed on the ROFR here.  Defendants' argument is misplaced. The ROFR *Homeowner's Rehab*, unlike OLCDC's ROFR, <u>expressly required a third-party offer</u>, the "terms of the proposed disposition" to the third party, and "whether the partner was willing to accept that offer."  *Id.* at 750, 761-62.  Consequently, finding no inconsistency between Section 42 and Congress's "decision to sell" requirement and the offer requirement <u>expressly agreed to by the parties in their contract</u>, the *Homeowner's Rehab* court upheld the parties' <u>agreed-to</u> offer requirement.  The facts of this case command no similar finding.

Additionally, Defendants' reliance upon *Senior Hous. Assistance Group v. AMTAX Holdings 260, LLC* (hereinafter, *SHAG*), C17-1115 RSM, 2019 WL 1417299 (W.D. Wash. Mar. 29, 2019), which held that a bona fide, enforceable offer was required to trigger a Section 42 ROFR, is equally misplaced.  The *SHAG* court's decision was rooted solely in what it deemed to be applicable Washington common law, not Section 42 or, at the very minimum, Florida common law.  *Id.* at *9-10.

In sum, the Court agrees with OLCDC that the ROFR must be read and interpreted in light of Section 42. Conducting such analysis under the particular contractual language at issue here, the Court concludes that the plain and unambiguous language, which lacks any other triggering mechanisms requires only a manifest decision to sell to trigger OLCDC's ROFR rights.

Significantly, even if this Court were to read and interpret the ROFR in accordance with Florida common law, or any common law for that matter, the Court would reach the same result. In fact, well-settled common law, including Florida common law, is squarely in accord. As particularly relevant here, in *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, the Florida Supreme Court expressly concurred that, absent other express requirements, "a right of first refusal . . . "ripen[s] into an option depending on whether the owner decides to sell." 986 So. 2d 1279, 1285-87 (Fla. 2008). Florida common law similarly recognizes that, unless the specific language of the right of first refusal at issue requires it, there is "no requirements of a binding contract" to trigger a right of first refusal. *See, e.g.*, *Vietor v. Sill*, 243 So. 2d 198, 199 (Fla. 4th DCA 1971); *accord McDonald's Corp.*, 2010 WL 4384214, at *2 (reciting *Vietor* and holding that the owner's execution and transmittal of a non-binding letter of intent to the plaintiff would, if proven, "constitute a willingness to sell the [property] which triggered [its] right of first refusal," despite the defendant's contention that a non-binding letter of intent did not constitute an enforceable "offer") (emphasis added); *Vorpe v. Key Island, Inc.*, 374 So. 2d 1035, 1036 (Fla. 2d DCA 1979) (citing *Vietor* and concluding that a covenant providing "a right of first refusal for 30 days should [owner] have an opportunity to sell the real property" required a "manifested [] intention to sell" in order for the "right of first refusal" to be "activated").

Defendants nevertheless rely on *Old Port Cove* and other Florida cases such as *Central Properties, Inc. v. Robbinson*, 450 So. 2d 277 (Fla. 1st DCA 1984) to argue that this Court should impose a third-party "offer" requirement onto the ROFR here.  However, the courts in those cases were discussing a very different type of right of first refusal.  At issue in *Old Port Cove*, for example, was a right of first refusal that, by its express terms, only permitted the defendants to purchase the plaintiff's property "upon the same terms and conditions as are proposed for its sale" to a third party (a "**meet-and-match ROFR**").  986 So. 2d at 1281.  In light of the meet-and-match nature of that right, the Florida Supreme Court adopted the following widely accepted definition of such a meet-and-match ROFR:

> A right of first refusal is a right to elect to take specified property **at the same price and on the same terms and conditions as those contained in a good faith offer** by a third person if the owner manifests a willingness to accept **the offer**.

*Id.* at 1285 (quoting *Pearson v. Fulton*, 497 So. 2d 898, 900 (Fla. 2d DCA 1986)) (emphasis added).  Such a meet-and-match ROFR, the Florida Supreme Court continued, therefore "ripens into an option once an owner manifests a willingness to accept a good faith offer." *Id*

Defendants rely upon this language to argue that the receipt of an "enforceable offer" is thus a triggering requirement imposed on all rights of first refusal under Florida common law.  But in so arguing Defendants erroneously overlook the Florida Supreme Court's subsequent clarification in *Old Port Cove* that rights of first refusal "vary in form: some require offering the property at a fixed price (or some price below market value), while others . . . simply allow the holder to purchase the property on the same terms as a third party." *Id.* at 1285 (emphasis added).  In other words, Defendants' argument entirely disregards *Old Port Cove's* own admonition that meet-and-match ROFRs, which by their express terms require a purchase "on the same terms as a third party" offer, are not the same as rights of first refusal that, as here,

proscribe the owner's ability to sell the property "without first offering" the property at a "fixed price" (a "**fixed-price ROFR**").  Defendants' legal theory is thus flawed.

Moreover, transposing this meet-and-match, third-party "offer" requirement onto a fixed-price ROFR, like OLCDC's ROFR, would be nonsensical.  Specifically, unlike a fixed-price ROFR, which supplies its own terms of sale, a meet-and-match ROFR necessarily requires the receipt of a third-party offer in order to supply the terms on which the holder of the right is entitled to purchase the property.  *Steinberg v. Sachs*, 837 So. 2d 503, 505-06 (Fla. 3d DCA 2003.  Put another way, "without knowing the terms of the sale [offered by the third party], the [rightholder] could not meet the offer of [the third party] and thus could not properly exercise their right of first refusal." *E.g.*, *Tribble v. Reely*, 557 P.2d 813, 817 (Mont. 1976).

Conversely, in the context of a fixed-price ROFR (like OLCDC's), requiring such a third party offer would serve absolutely no purpose because a fixed-price ROFR supplies its own definite terms of sale (here, debt plus taxes).  Thus, adding an "offer" requirement to OLCDC's ROFR where none is expressly included or supported, as Defendants urge, would only serve to make it nearly impossible for OLCDC to exercise its ROFR.  *See Homeowner's Rehab,* 99 N.E.3d at 759, 761-62 & n.16 (refusing to interpret the right of first refusal in such a way that "the nonprofit developer could be denied any meaningful opportunity to acquire the property interest at the § 42 price").

Moreover, common law across the nation undermines Defendants' interpretation and supports OLCDC's interpretation.  Universally consistent common law on rights of first refusal recognizes that the defining characteristic of the right is that its "binding effect" turns on whether "the offeror decides to sell."  *Winberg v. Cimfel*, 532 N.W.2d 35, 39 (Neb. 1995) (quoting 11 Samuel Williston, A Treatise on the Law of Contracts § 1441A at 948-50 (3d ed. 1968)); *Barling*

*v. Horn*, 296 S.W.2d 94, 98 (Mo. 1956) (a right of first refusal "requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price") (quoting Vol. VI, American Law of Property, § 26.64, p. 507)) (emphasis added).

Lastly, Defendants' interpretation that the ROFR's 45-day notice period constitutes the ROFR's trigger fails.  Contrary to Defendants' assertion, this notice period is a procedural safeguard providing the minimum amount of time that Defendants must afford OLCDC to consider whether to exercise its right; it cannot serve as the simultaneous trigger and breach of the ROFR, as Defendants urge.  *See Riverside Surgery Ctr., LLC v. Methodist Health Sys., Inc.*, 182 S.W.3d 805, 807, 812 (Tenn. Ct. App. 2005).

Defendants' affirmative defenses are insufficient as a matter of law.  For a plaintiff "to obtain a summary judgment when the defendant asserts affirmative defenses, the plaintiff must either disprove those defenses by evidence or establish the legal insufficiency of the defenses." *Bunner v. Florida Coast Bank of Coral Springs, N.A.*, 390 So. 2d 126, 127 (Fla. 4th DCA 1980). Here, OLCDC has carried its burden of disproving each of Defendants' affirmative defenses in both respects. The undisputed material facts conclusively establish that OLCDC did not force a sale of Aswan Village upon Defendants, did not engage in any wrongdoing, and did not trick Defendants.  Quite the opposite, Defendants were aware at all times of the applicable rights and obligations, unilaterally solicited proposals for the sale of Aswan Village, and OLCDC merely sought to lawfully protect its interests and exercise its contractual rights.  There is no material evidence of record to support Defendants' assertion that OLCDC's request for more information on March 18, 2019 caused Defendants to solicit proposals (Defendants, indeed, already had

them) and/or coerced Defendants to "decide[] to move forward" with LAC's LOI.  Defendants'
affirmative defenses thus fail as a matter of fact.

In addition, Defendants' affirmative defenses fail as a matter of law.  First, Defendants'
equity-based affirmative defenses, such as unclean hands, are insufficient as a matter of law
because they do not apply to a claim for specific performance of a contract for real estate under
Florida law.  *E.g.*, *Florida Kelly Plantation v. Gilliam, Ltd.,* No. 3:11CV159/EMT, 2012 WL
13032897 at * 8-9 (N.D. Fla. Sept. 18, 2012) (quoting *Henry v. Ecker*, 415 So. 2d 137, 140 (Fla.
5th DCA 1982*))*.  Second, there is no evidence in this record to suggest Plaintiff failed to satisfy
any conditions precedent.  (Aff. Defense II).   Third, Defendants' recoupment defense is actually
predicated on OLCDC obtaining specific performance; thus, it cannot serve to bar it.   (Aff.
Defense X) And fourth, Defendants' defense of breach of the implied covenant of good faith and
fair dealing fails because the conduct about which Defendants complain—OLCDC's alleged
acquiescence to Defendants' unilateral sales efforts—has no basis in the ROFR or in the
Amended Operating Agreement.  Instead, it is premised on an entirely separate contract—the
ADA Agreement.  (Aff. Defense XI).  Defendants' assertion that OLCDC breached an implied
covenant under a different contract cannot be used to bar OLCDC's claim for specific
performance under the ROFR.  *See Focus Mgmt. Group USA, Inc. v. King*, 171 F. Supp. 3d
1291, 1300 (M.D. Fla. 2016); *Ament v. One Las Olas, Ltd.*, 898 So. 2d 147, 149 (Fla. 4th DCA
2005).

OLCDC is also entitled to summary judgment on each of Defendants' Counterclaims.
First, Count I fails based on the undisputed failure to satisfy conditions precedent.  *See, e.g.*,
*Garcia v. Cosicher*, 504 So. 2d 462, 462 (Fla. 3d DCA 1987).  Here, Defendants concede that
OLCDC never "directed" HKA to cause the Company to place Aswan Village "on the market for

sale."  (Burnes Dep. at 80:21-23; 85:1-18; Hess Dep. at 50:1-52:8; 66:15:67:8; 68:10-15.) Defendants, moreover, assert that they never even offered to sell Aswan Village to OLCDC. (Hess Depo. at 71:7-15; Compl., Ex. H). However, *all* of these things are **express conditions precedent** to HKA's rights under Section 10 of the ADA Agreement, which is the premise of its claim under Count I.  Thus, Count I fails as a matter of law. *See Garcia*, 504 So. 2d at 462.

Count II (unjust enrichment) similarly fails based on (1) the undisputed existence of express contracts governing the same subject matter, and (2) the fact that HKA received exactly what it bargained for under those contracts.

Defendants do not dispute that a valid contract governs.  Rather, they claim that OLCDC's ability to exercise the ROFR it bargained-for would confer an unjust windfall on OLCDC, thus overriding the ROFR.  Defendants' argument fails. =.  First, it is contrary to the settled foregoing Florida law.  Second, it is undisputed that HKA attempted to obtain OLCDC's agreement to give up its ROFR in 2014.  But OLCDC refused, and the ROFR remained.  The compromise struck was the addition of a "distinct" forced sale right.  HKA's attempt to now renege on its choice to allow the distinct ROFR to remain, after freely triggering it, and nevertheless force OLCDC to buyout HKA, would be anything but just.  *See Mercer v. Lemmens*, 40 Cal. Rptr. 803, 806 (Cal. Ct. App. 1964) (refusing defendant's "bad faith" attempt to circumvent the agreed-upon ROFR due to the foreseeable appreciation of the at-issue property); *Schroeder v. Gemeinder*, 10 Nev. 355, 369 (1875) (same).

Accordingly, for the reasons set forth above,

**ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion for Summary Judgment against OLCDC is DENIED, and OLCDC's Renewed Motion for Partial Summary Judgment against Defendants is **GRANTED**;

CASE NO.:  2019-16913-CA-01 (44)

2.      Defendant HallKeen Management's Motion for Summary Judgment on Count I against OLCDC is DENIED;

3.      OLCDC's Motion for Judgment on the Pleadings is **DENIED AS MOOT;**

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 07/07/20.

_____

WILLIAM THOMAS
CIRCUIT COURT JUDGE

<div style="border:2px solid red">

**No Further Judicial Action Required on <u>THIS MOTION</u>
CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT**

</div>

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.
Copies Furnished To:

All Counsel on attached Service List**SERVICE LIST**


DLA PIPER LLP (US)
Lida Rodriguez-Taseff
Email: Lida.Rodriguez-Taseff@us.dlapiper.com
Secondary: Dawn.Perez@us.dlapiper.com

and

WINTHROP & WEINSTINE, P.A.
David A. Davenport
Email: ddavenport@winthrop.com
Justice E. Lindell
Email: jlindell@winthrop.com

#8345731

CASE NO.:  2019-16913-CA-01 (44)

*Counsel for Plaintiff Opa-Locka Community Development Corporation, Inc.*

STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
Mark D. Solov
Email: msolov@stearnsweaver.com
Secondary: mfigueras@stearnsweaver.com
Jose G. Sepulveda
Email: jsepulveda@stearnsweaver.com
Secondary: mleon@stearnsweaver.com
Ryan T. Thorntons
Email: rthornton@stearnsweaver.com
Secondary: cveguilla@stearnsweaver.com
Alejandro D. Rodriguez
Email: arodriguez@stearnsweaver.com
Secondary: mfigueras@stearnsweaver.com

*Counsel for Defendants*
*HK Aswan, LLC, HallKeen Management, Inc., and Aswan Village Associates, LLC*

#8345731